William **TWOMBLY** and Lawrence **Marcus**, individually and on behalf of all others similarly situated, Plaintiffs,

v.

**BELL ATLANTIC CORP.**, Bellsouth Corp., Qwest Communications Int'l, Inc., SBC Communications, Inc., and Verizon Communications, Inc., Defendants.

No. 02 Civ. 10220(GEL).

United States District Court, S.D. New York.

Oct. 8, 2003.

---

J. Douglas Richards, Milberg Weiss Bershad Hynes & Lerach LLP, New York, N.Y. (Michael M. Buchman, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY; Richard S. Schiffrin, Joseph H. Meltzer, and Krishna Narine, Schiffrin & Barroway, LLP, Bala Cynwyd, PA, on the brief), for Plaintiffs.

Steven G. Bradbury, Kirkland & Ellis, Washington, DC (Colin R. Kass, Kirkland & Ellis, Washington DC; John Thorne and Robert J. Zastrow, Verizon Communica-

tions, Inc., Arlington, VA, on the brief), for Defendant Verizon Communications, Inc.

Hector Gonzalez, Mayer, Brown, Rowe & Maw, New York, N.Y. (Richard J. Favretto, Mayer, Brown, Rowe & Maw, New York, NY; J. Henry Walker, Marc W.F. Galonsky, and Ashley Watson, BellSouth Corp., on the brief), for Defendant Bell-South Corp.

Mark C. Hansen, Kellogg, Huber, Hansen, Todd & Evans, P.L.L.C., Washington, DC (Neil M. Gorsuch and Michael Guzman, Kellogg, Huber, Hansen, Todd & Evans, P.L.L.C.; Maria T. Galeno, Pillsbury Winthrop, LLP, on the brief), for Defendant SBC Communications Inc.

Peter K. Vigeland, Wilmer, Cutler & Pickering, New York, N.Y. (William J. Kolasky, Wilmer, Cutler & Pickering, Washington, DC, on the brief), for Defendant Qwest Communications Int'l, Inc.

## OPINION AND ORDER

LYNCH, District Judge.

Plaintiffs William Twombly and Lawrence Marcus bring this putative class action on behalf of themselves and all other individuals who purchased local telephone or high speed internet services in the continental United States between February 8, 1996, and the present. They allege that defendants Verizon Communications, Inc. ("Verizon"), BellSouth Corporation ("BellSouth"), Qwest Communications International, Inc. ("Qwest"), and SBC Communications, Inc. ("SBC"), (collectively, "defendants"), conspired to prevent competitive entry into their respective local telephone and internet services markets, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. Defendants now move to dismiss plaintiffs' Amended Complaint, pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim on which relief can be granted. For the reasons discussed below, defendants' motion will be granted.

## BACKGROUND

The following facts are taken from the Amended Complaint, except where noted. All factual allegations in the Amended Complaint are assumed to be true for purposes of this motion.

Defendants Verizon, BellSouth, Qwest, and SBC together control over ninety percent of the market for local telephone and high-speed internet services in the continental United States. (Am.Compl.¶ 21.) They are the descendants of American Telephone and Telegraph Company ("AT & T"), and its wholly owned subsidiaries, the Bell Operating Companies ("BOCs"), which in 1934 owned 80 percent of all local telephone lines and services in the country. (Id. ¶ 17.) While the provision of local telephone service was initially competitive, the inconvenience of navigating multiple, unconnected telephone networks led "to the establishment of telephone as a monopoly service" and to AT & T's dominance. H.R.Rep. No. 104–204(I) (1995), reprinted in 1996 USCCAN 10, 50.

In 1974, the United States filed suit against AT & T, alleging that it had violated the Sherman Act by using its control of local exchange facilities to suppress competition in related markets. (Id. ¶ 19.) Eight years later, the parties settled the case by entering into a consent decree, which the District Court memorialized by signing the Modified Final Judgment ("MFJ"), thereby creating the industry structure that persists today. (Id. ¶ 20.) In 1984, pursuant to the MFJ, AT & T divested itself of the seven regional Bell Operating Companies and exited from the local telephone market. (Id. ¶ 21.) The BOCs were given monopoly power over local telephone services in their respective regions, but were restricted from competing in the long distance market, and were required to provide exchange access to all interexchange (long-distance) carriers,

such as Sprint and MCI. (*Id.* ¶ 20.) *See United States v. AT & T,* 552 F.Supp. 131 (D.D.C.1982).

The structure created by the MFJ allowed the seven BOCs exclusive control over their respective regions. This did not change even as the original seven merged into larger companies controlling larger regions, resulting in the four companies named as defendants controlling the local telephone markets for ninety percent of the continental United States. (Am. Compl.Ex. A.) Thus, since 1982, the local phone service market has consisted of "state-sanctioned local monopolies." *Law Offices of Curtis V. Trinko L.L.P. v. Bell Atlantic Corp.,* 305 F.3d 89, 93 (2d Cir. 2002), *cert. granted, Verizon Comms., Inc. v. Law Offices of Curtis V. Trinko L.L.P.,* 538 U.S. 905, 123 S.Ct. 1480, 155 L.Ed.2d 224 (2003). (*See also* Am. Compl. ¶ 23.) While the business activities of these monopolies were heavily regulated by state and federal agencies, they were also "frequently protected from competition by government barriers to entry[, as] the majority of States restrict[ed] full and fair competition in the local exchange, either by statute or through the public utility commission's regulations." H.R.Rep. No. 104–204(I), 1996 USCCAN at 49. Thus, as plaintiffs allege, "[l]ocal exchange carriers historically operated in their local franchise areas free of competition, pursuant to exclusive franchises granted by state regulatory agencies." (Am.Compl.¶ 23.)

The Telecommunications Act of 1996, Pub.L. No. 104, 110 Stat. 56 (the "Act"), is designed to replace the heavy regulation in the local telephone markets with competition. H.R.Rep. No. 104–204(I), 1996 USCCAN at 50. It "opens the markets for both local telephone and long-distance services to effective competition." (Am. Compl.¶ 26.) Specifically, the Act requires incumbent local exchange carriers ("ILECs"), such as the defendants, to facilitate competitors' entry into their local telephone markets, in return for the opportunity to compete in the long-distance market. (*Id.* ¶ 30.) Because building their own telecommunications infrastructure would be prohibitively expensive for most competing local exchange carriers ("CLECs"), the Act provides CLECs with a shortcut into the market by obligating ILECs to sell access to elements of their networks at wholesale rates. 47 U.S.C. § 251.

A CLEC may "obtain access to an incumbent's network in [one of] three ways: It can purchase local telephone services at wholesale rates for resale to end users; it can lease elements of the incumbent's network on an unbundled basis; and it can interconnect its own [network] with the incumbent's network" and infrastructure. *AT & T v. Iowa Utils. Bd.,* 525 U.S. 366, 371–72, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999) (citing 47 U.S.C. § 251); *Trinko,* 305 F.3d at 94 (describing operation of § 251). (*See* Am. Compl. ¶ 32.) A CLEC's business is therefore founded on its relationship with the ILEC. This relationship is itself regulated by the duties that the Act places on ILECs, but the parties may opt out of the Act's provisions by negotiating an interconnection agreement and having it approved by a state commission. 47 U.S.C. § 252. The interconnection agreement, rather than § 251, then governs the relationship between the parties, and disputes arising thereunder may be arbitrated by the state commission. *Trinko,* 305 F.3d at 102–03.

Plaintiffs allege that, despite the Act's mandate that the ILECs provide access to their telecommunications infrastructure on "just, reasonable and non-discriminatory terms," (Am.Compl.¶¶ 27–28), the defendants have made it nearly impossible for CLECs to enter their local service markets. According to plaintiffs, defendants

have refused to provide potential CLECs with network connections and services of equal quality to those they provide to their retail customers, billed CLEC customers in order to ruin CLECs' customer relations, delayed in providing network elements, refused CLECs the use of certain facilities, and generally used their "monopoly power and exclusive control over essential facilities" to negotiate unfair agreements with would-be CLECs. (*Id.* ¶ 47.) The complaint alleges that these actions were taken not simply on behalf of each individual defendant within its local territory, but pursuant to an agreement among all defendants to collectively thwart the efforts of competing companies. (*Id.* ¶ 50.) Plaintiffs assert that this anti-competitive behavior has been quite successful, citing Congressman John Conyers's 2001 statement that potential CLECs "invested tens of billions of dollars ... today, most of those companies have been devastated by the anti-competitive behavior and procrastination of the Bell monopolies." (Pls. Mem. at 2; Buchman Aff. Ex. B; *see also* Am. Compl. ¶ 47.)

Plaintiffs also allege that defendants have engaged in parallel conduct by not competing as CLECs in each others' respective territories, "which would be anomalous in the absence of an agreement among the [defendants] not to compete with one another." (Am.Compl.¶¶ 40–41.) Because the territories serviced by defendants are, in part, non-contiguous, sometimes looping around and surrounding each other (*see id.* Ex. B), defendants' collective failure to move into adjacent local phone service markets is, plaintiffs assert, highly suspicious. In addition, Qwest's CEO, Richard Notebaert, has made statements that could suggest that becoming CLECs in other markets would have been in defendants' economic interests, absent an agreement not to compete. (*Id.* ¶ 42.)

Defendants' alleged motives for conspiring, both to keep out CLECs in general, and to refrain from entering each others' territories, was to maintain their exclusive control over their respective territories, and to prevent any CLECs from succeeding, or discovering that it would be possible to succeed, in defendants' markets. (*Id.* ¶ 50.) As a result of the conspiracy, plaintiffs have been deprived of the opportunity to purchase local telephone and high-speed internet services from a CLEC rather than an ILEC, and have been forced to pay the supracompetitive rates of ILECs rather than the presumably lower rates that competition would have fostered. (*Id.* ¶ 66.)

Defendants now move to dismiss the Amended Complaint, asserting that plaintiffs have not alleged sufficient facts from which a conspiracy to violate the Sherman Act can be inferred, and that plaintiffs' claims for treble damages are barred by the filed rate doctrine. (Defs. Mem. at 1–3.) Defendant BellSouth also moves to dismiss the suit as against it, for lack of personal jurisdiction. (BellSouth Mot. at 1.)

### DISCUSSION

On a motion to dismiss under Fed. R.Civ.P. 12(b)(6), the Court must accept "as true the facts alleged in the complaint," *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 32 F.3d 697, 699–700 (2d Cir.1994), and may grant the motion only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Thomas v. City of New York*, 143 F.3d 31, 36 (2d Cir.1998) (citations omitted); *see also Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir.1996) (stating that when adjudicating motion to dismiss under Fed.R.Civ.P. 12(b)(6), the "issue is not whether a plaintiff will ultimately prevail

but whether the claimant is entitled to offer evidence to support the claims" (internal quotation marks and citations omitted)). When deciding such a motion, the Court may consider documents attached to the complaint as exhibits or incorporated in it by reference, and such facts as are suitable for judicial notice pursuant to Fed. R.Evid. 201. *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir.1991). All reasonable inferences are to be drawn in the plaintiffs' favor, which often makes it "difficult to resolve [certain questions] as a matter of law." *In re Independent Energy Holdings PLC*, 154 F.Supp.2d 741, 748 (S.D.N.Y.2001).

## I. *The Pleading Standard*

Section 1 of the Sherman Act prohibits "every contract, combination ... or conspiracy in restraint of trade or commerce." 15 U.S.C. § 1. Thus, absent an agreement among competitors to restrain trade, anti-competitive behavior does not violate § 1. *Modern Home Inst., Inc. v. Hartford Accident & Indemnity Co.*, 513 F.2d 102, 108–09 (2d Cir.1975) ("Fundamental then to any § 1 claim is the finding of an agreement, express or otherwise, between two or more persons."). Direct evidence of such an agreement is often impossible to obtain, however, and so an illegal agreement must often be inferred from circumstantial evidence, including the public conduct and "business behavior" of competitors, as well as market facts. *Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540, 74 S.Ct. 257, 98 L.Ed. 273 (1954). Instances in which competing firms embark upon similar courses of conduct may suggest that the firms have agreed to manipulate the market in some way. However, the Supreme Court "has never held that proof of parallel business behavior conclusively establishes agreement or, phrased differently, that such behavior itself constitutes a Sherman Act offense." *Id.* at 541, 74

S.Ct. 257. Thus, while plaintiffs may allege a conspiracy by citing instances of parallel business behavior that suggest an agreement, courts must be cognizant of the fact that, while "[c]ircumstantial evidence of consciously parallel behavior may have made heavy inroads into the traditional judicial attitude toward conspiracy[, ...] 'conscious parallelism' has not yet read conspiracy out of the Sherman Act entirely." *Id.*

■ Moreover, parallel action is a common and often legitimate phenomenon, because similar market actors with similar information and economic interests will often reach the same business decisions. Courts must therefore distinguish between conduct that represents the natural convergence of competitors' market behavior, and conduct that appears to have been taken pursuant to an agreement. In the summary judgment context, the Second Circuit requires plaintiffs to present evidence suggesting that the defendants' parallel conduct has resulted from an agreement rather than "merely from independent ... conduct by firms acting in their own self-interests." *Kramer v. Pollock–Krasner Found.*, 890 F.Supp. 250, 255 (S.D.N.Y.1995) (citing *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 254 (2d Cir. 1987)). Plaintiffs may satisfy this standard by establishing at least one "plus factor" that tends to exclude independent self-interested conduct as an explanation for defendants' parallel behavior. The plus factors include evidence that the parallel behavior would have been against individual defendants' economic interests absent an agreement, or that defendants possessed a strong common motive to conspire. *Apex Oil*, 822 F.2d at 253–54.

While the Second Circuit's case law on parallel conduct conspiracies has developed mainly in the context of summary judgment, district courts have required

that plaintiffs allege plus factors in order to withstand motions to dismiss as well. *See, e.g., Kramer,* 890 F.Supp. at 255–56; *Levitch v. Columbia Broadcasting System, Inc.,* 495 F.Supp. 649, 675 (S.D.N.Y.1980) (stating that "the vast majority of courts which have considered the question" have held that plaintiffs must allege facts suggesting the interdependence of the parallel conduct in order to state a claim). This requirement is necessary to ensure that plaintiffs actually state a claim on which relief can be granted, by separating complaints that allege simple parallel action that does not suggest a conspiracy and is therefore not actionable under § 1, from complaints that allege parallel action that could be the result of a conspiracy, and that plaintiffs are therefore entitled to explore in discovery.

■ The plus factors pleading requirement is also an expression of the longstanding rule that "a bare bones statement of conspiracy or of injury under the antitrust laws without any supporting facts permits dismissal" of a complaint. *Heart Disease Res. Found. v. General Motors Corp.,* 463 F.2d 98, 100 (2d Cir.1972). While there is no special pleading standard for conspiracy, simply alleging that two or more defendants participated in a "conspiracy," without more, is insufficient to withstand a motion to dismiss. *Yellow Page Solutions, Inc. v. Bell Atlantic Yellow Pages Co.,* No. 00 Civ. 5663(MBM), 2001 WL 1468168, at *9 (S.D.N.Y. Nov.19, 2001). Thus, plaintiffs must always assert facts that, if true, support the existence of a conspiracy, such as motivation or conduct that lends itself to an inference of an agreement. In the context of parallel conduct allegations, simply stating that defendants engaged in parallel conduct, and that this parallelism must have been due to an agreement, would be equivalent to a conclusory, "bare bones" allegation of conspiracy. *Id.* Viewed in this light, the plus factors are simply examples of allegations that are sufficiently suggestive of a conspiracy to warrant discovery.

The requirement that plaintiffs allege specific facts suggesting a conspiracy is somewhat in tension with Fed.R.Civ.P. 8, which requires only a "short and plain statement of the claim," and allows plaintiffs to base their complaints on "statement[s] of ultimate facts," *Heart Disease Res. Found.,* 463 F.2d at 100. Indeed, plaintiffs argue that *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), establishes that plaintiffs need only assert that a conspiracy existed, rather than pleading any facts from which one can be inferred, because evidence gained in discovery may permit plaintiffs to prove their case with direct, rather than circumstantial, evidence. *Swierkiewicz* held that employment discrimination complaints need not allege the prima facie case established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), because the Title VII burden-shifting framework is designed to allow plaintiffs to prove discrimination with circumstantial evidence.[1] At the pleading stage, however, it is impossible to predict whether plaintiffs might discover direct evidence, and will therefore never need to avail themselves of *McDonnell*

---

1. Under this rule, a plaintiff would not only have to allege that she was a member of a protected class, was qualified for her position, and suffered an adverse employment action, but also would have to state facts suggesting that the adverse employment action occurred under circumstances raising an inference of discrimination. *Swierkiewicz,* 534 U.S. at 509, 122 S.Ct. 992. This presented a problem for many plaintiffs who, before any kind of discovery, would not be aware of the facts necessary to support an inference of discrimination, such as how similarly situated employees had been treated, or the employer's overall employment practices.

*Douglas* burden shifting. The extra pleading requirement therefore placed an artificial and unfair burden on plaintiffs. *Swierkiewicz*, 534 U.S. at 511–12, 122 S.Ct. 992. In support of its conclusion, the Court emphasized Rule 8's liberal standard of notice pleading, reasoning that alleging the elements of the Title VII prima facie case was unnecessary to give defendants notice of the claim. *Id.* at 513, 122 S.Ct. 992. Thus, plaintiffs contend that, like the Title VII prima facie case, the parallel action "plus factors" are an evidentiary construct designed to be used at the summary judgment stage, when plaintiffs must rely on inferential evidence, and that *Swierkiewicz* establishes that they need not be pled to withstand a motion to dismiss. (Pls. Mem. at 5.)

Plaintiffs concede, however, that *Swierkiewicz* did not change the law of pleading (Tr. 22),[2] but simply re-emphasized the principles behind Rule 8 in order to establish that the Second Circuit's use of a heightened pleading standard for Title VII cases was contrary to the Federal Rules' structure of liberal pleading requirements, broad discovery, and use of summary judgment as the primary means of disposing of cases. *Swierkiewicz*, 534 U.S. at 513, 122 S.Ct. 992. Thus, *Heart Disease Research Foundation's* holding that plaintiffs must allege facts to support claims of conspiracy, even in light of Rule 8, 463 F.2d at 110, remains the law of this Circuit. This requirement of supporting facts is simply not analogous to the requirement that Title VII plaintiffs allege the *McDonnell Douglas* prima facie case, and is consistent with Rule 8 for two reasons.

First, the doctrine of conscious parallelism allows plaintiffs to state a claim by alleging conduct that is, in itself, not prohibited by § 1 of the Sherman Act. Because parallel conduct is often simply the result of similar decisions by competitors who have the same information and the same basic economic interests, allowing simple allegations of parallel conduct to entitle plaintiffs to discovery circumvents both § 1's requirement of a conspiracy and Rule 8's requirement that complaints state claims on which relief can be granted. *Kramer*, 890 F.Supp. at 255–56. In contrast, a Title VII plaintiff can state a claim by alleging simply that she was discriminated against in her employment, and so requiring allegations of the prima facie case went beyond ensuring that a plaintiff had stated a legal claim, to adjudicating whether she would eventually be able to prove her claims.

Second, allegations of plus factors are necessary to give defendants notice of plaintiff's theory of the conspiracy. Because the factual basis of a Title VII claim is fairly self-evident – plaintiff suffered an adverse job action and alleges that it was the result of discrimination – the defendant will be apprised of the basic facts, and will know how to defend the action, even without the benefit of any allegations that raise the inference that discrimination actually occurred. In contrast, a plaintiff's factual and economic theory of a conspiracy is not evident from a conclusory allegation of conspiracy, and there is simply no way to defend against such a claim without having some idea of how and why the defendants are alleged to have conspired. The plus factors are therefore intended to give defendants notice of plaintiffs' legal theory, and of the "conduct which is alleged to be conspiratorial." *Levitch*, 495 F.Supp. at 675 ("This requirement is fully consistent with the liberal notice-pleading requirements in that it seeks only to notify

---

**2.** All cites to "Tr." refer to the transcript of the oral argument that took place before the

Court on August 1, 2003.

the defendant of the legal theory upon which plaintiff intends to proceed."). Thus, the plus factors requirement is consistent with Rule 8, and remains in effect after *Swierkiewicz.*

## II. *Plaintiffs' Allegations of Conspiracy*

Plaintiffs must allege facts from which a conspiracy can be inferred in order to state a claim under § 1. The alleged conspiracy between the defendants involved two agreements. (1) to collectively keep CLECs from successfully entering their markets, and (2) to refrain from attempting to enter each other's markets as CLECs. (Am.Compl.¶¶ 40, 47.) Thus, plaintiffs assert that, in furtherance of these agreements, defendants have all violated the provisions of the Act in order to render it impossible for CLECs to survive by competing to provide local telephone services, and have all failed to become CLECs in each other's markets, despite the potential profits from doing so. Determining whether these instances of parallel behavior raise the inference that defendants agreed on their course of conduct involves examining plaintiffs' allegations as to the markets in which the defendants compete and their resulting economic interests.

This inquiry is admittedly difficult to distinguish from the factual analysis that is more appropriate to summary judgment, as is evidenced by the fact that cases involving motions to dismiss often cite summary judgment cases in support of their conclusions that plaintiffs have not alleged sufficient facts. *See, e.g., Kramer,* 890 F.Supp. at 255–56. While conclusory allegations may not suffice to state a claim, the Court must be cautious to avoid making findings or assumptions of fact without a complete factual record, and plaintiffs must not be expected to adduce evidence without having had the opportunity for discovery. The crucial inquiry, therefore, is what inferences naturally arise from the facts that plaintiffs have pled, taking all facts in the Amended Complaint as true. In the context of parallel conduct claims, the basic requirement that plaintiffs must fulfill is to allege facts that, given the nature of the market, render the defendants' parallel conduct, and the resultant state of the market, suspicious enough to suggest that defendants are acting pursuant to a mutual agreement rather than their own individual self-interest. This determination necessarily entails beginning with background propositions about how the market works when firms are competing, what it might look like if subject to an anti-competitive agreement, the economic interests of the market actors, and how those interests would cause them to act. While these questions resemble the factual issues that would have to be decided in the context of a summary judgment motion, on a motion to dismiss the Court may properly draw these background assumptions only from the facts pleaded in the complaint and the relevant statute, and may rely only on such background facts about the market and its history that are appropriate for judicial notice.

In this case, it is impossible to draw any inferences from plaintiffs' allegations regarding the state of the market actors relative to one another without being cognizant of the industry's history and regulation. Plaintiffs have attached to the Amended Complaint a map of defendants' respective territorial markets, which evidences the degree to which the defendants operate in separate markets. (Am. Compl.Ex. A.) Verizon controls the entire Northeast except for Connecticut; Bell South the Southeast; Qwest the Pacific Northwest and states as far east as Minnesota and as far south as New Mexico; and SBC the Midwest down to Texas, plus California and Nevada. (*Id.*) Thus, while the territories are not completely contiguous, the geographic segregation of the

BOCs is striking. This overly neat allocation might be enough in itself to support an inference of conspiracy, in most industries, where one could view the defendants as non-monopolistic competitors who had begun competing in an open market and then apparently arranged it into a pattern of territorial fiefdoms. As discussed above, however, the telecommunications industry's history is hardly one of open competition between many firms. The BOCs were given monopolies in their respective territories as part of the MFJ in 1982, and state regulation maintained these monopolies and their boundaries up until 1996. (Am.Compl.¶¶ 23, 27.) Even had the BOCs wanted to compete with each other, they would have been prevented from doing so by the entry barriers protecting each BOC. Thus, the geographic allocation evident from the map of BOC territories is not in itself suggestive of an anti-competitive agreement, shaped as it is by decades of state and federal regulation. The operative question, therefore, is whether it is possible to infer that the 1996 Act's permitting inter-territorial competition should have prompted the BOCs to move into each other's territories, and whether, seven years after the passage of the Act, the alleged failure of the BOCs to do so is suspicious enough to suggest a conspiracy.

Defendants argue that the fact that their respective territories have not merged into one competitive market is natural in light of the industry's history and defendants' consequent economic interests. (Defs. Mem. at 14–17.) It is in each individual defendant's interests to keep CLECs out of their respective markets, they contend, and not in their interests to attempt to expand into other territories as CLECs. Accordingly, we must turn to the facts alleged in the Amended Complaint, to determine whether those allegations support an inference that defendants' conduct results from a conspiracy, rather than from their pursuit of their individual interests and the structure of the relevant markets.

## A. *Conspiracy To Thwart CLECs*

■ Plaintiffs' theory that defendants acted pursuant to an agreement to keep CLECs from entering their markets by delaying their implementation of § 251 of the Act is not persuasive. Plaintiffs concede, as they must, that it is in each ILEC's individual economic interest to attempt to keep CLECs out of its market. (Tr. 29.) Defendants have challenged in the courts the Act's requirements that they provide their services to CLECs at wholesale prices, as well as the FCC's implementing regulations, arguing primarily that the methods by which state commissions were to determine the prices at which CLECs would be able to purchase services from ILECs failed to take into account their costs and resulted in "artificially low" prices. *Iowa Utils. Bd. v. FCC*, 120 F.3d 753, 793 (8th Cir.1997) (cited in Am. Compl. ¶ 36). Thus, the ILECs have argued that they were being forced to subsidize CLECs' entry into their markets. *Id.* Given their view of the pricing scheme to which they had to adhere, it would be in each ILEC's individual economic interest to attempt to discourage CLECs from entering the market and to render it difficult for them to survive once they had entered, as well as to challenge the pricing rules themselves. Thus, defendants' parallel action does not naturally give rise to an inference of an agreement, since the behavior of each ILEC in resisting the incursion of CLECs is fully explained by the ILEC's own interests in defending its individual territory.

Although conceding that such resistence is the natural course for ILECs, plaintiffs nevertheless contend that defendants needed an agreement to thwart CLECs'

efforts because it was in their collective interest to ensure that all four ILECs would not allow any CLECs into their markets. Thus, they claim, defendants had two common motives to conspire to ensure that they all acted in the same ways. First, any CLEC that succeeded in one ILEC's territory would be more likely to "present a competitive threat" in other ILECs' territories. Second, if a CLEC were to succeed in one territory, it would prove that CLECs could be successful in other places if the other ILECs were not attempting to thwart them. (Am. Compl.¶ 50.) These are essentially arguments that, even if it was in each ILEC's interest to keep CLECs out, the ILECs collectively had reason to ensure that no CLEC anywhere could succeed, presumably in order to prove to Congress that its intended system of competition was impracticable. (Tr. 29.)

This theory does not posit any motivation independent of defendants' individual economic interests, however. Given that each ILEC has reason to want to avoid dealing with CLECs and having to "subsidize" their entry into the market, each ILEC would attempt to keep CLECs out, regardless of the actions of the other ILECs. The asserted motivations to make an agreement—the possibility that CLECs that make inroads in other ILECs' territories might want to compete in, for instance, Verizon's market, or that CLECs' success in other markets might suggest that Verizon was engaging in illegal efforts to thwart the CLECs in its own market— are not considerations that would affect Verizon's initial decision as to whether or not to fight the CLECs in its own market. That decision would be based, as plaintiffs' allegations suggest (Am.Compl.¶¶ 39, 47), only on its economic interest in maintaining its own market power, and since the ILECs are similar firms with similar information and interests, they could rationally expect that each of them will reach the same conclusions as to the course of action that best suits their interests, whether or not an agreement exists. *Kramer*, 890 F.Supp. at 255–56. No agreement would be necessary for all ILECs to be relatively certain to reap the alleged added benefits to be gained from parallel action. Plaintiffs suggest no reason whatever to believe that any of the defendants, absent an agreement with the others, would have had any reason to adopt a policy of welcoming CLECs into its territory. Thus, the motives that plaintiffs have proffered do not provide any basis to infer that defendants' conduct was the result of anything but their individual economic interests.

### B. *Conspiracy Not To Compete As CLECs*

■ Plaintiffs' second theory, that defendants refrained from entering each other's markets as CLECs, presents a closer question. Plaintiffs have alleged that, for each defendant, becoming a CLEC in another ILEC's territory would be an attractive business opportunity because, as the ILECs themselves have complained, CLECs hurt ILECs by buying their services and network elements at low rates. (Am.Compl.¶¶ 39, 40.) Competing as CLECs, plaintiffs claim, would also be feasible in light of the fact that, due to mergers, each ILEC controls some territory that is completely surrounded by another ILEC's territory. For instance, SBC controls Connecticut, but Verizon controls the rest of the Northeast, so it should be an attractive proposition for Verizon to become a CLEC in Connecticut. (*Id.* ¶ 40.) In addition, plaintiffs allege that Richard Notebaert, CEO of Qwest, stated that competing as a CLEC "might be a good way to turn a quick dollar but that doesn't make it right." (*Id.* ¶ 42.) According to plaintiffs, his statement suggests that moving into other ILECs' markets as a CLEC would be in

Qwest's economic interest, especially since Qwest was experiencing financial difficulties at the time (*id.* ¶ 43), but that such conduct would not be "right" because of the ILECs' agreement not to compete with each other. Plaintiffs' basic theory, therefore, is that refraining from competing as CLECs was against the economic interests of each of the defendants, absent the assurance that each defendant would retain complete market power in its territory because none of the other defendants would attempt to become CLECs in other markets. In light of the structure of the market as evidenced by the allegations in the Amended Complaint and the provisions of the 1996 Act, however, it is apparent that this conduct is also attributable to defendants' individual economic interests, and therefore does not raise an inference of conspiracy.

Plaintiffs' theory reflects a number of assumptions about the nature of the market in which CLECs operate, and the relationship between being an ILEC and being a CLEC. Most fundamentally, plaintiffs assume that moving into other markets as CLECs would be in ILECs' individual economic interests. This would be the case only if it appears to be profitable to do so; in other words, if the financial outlay involved in becoming a CLEC is expected to be outweighed by the profits to be gained. Plaintiffs also assume that ILECs' geographic proximity to certain other territories, as well as the ILECs' economic power, would give them "substantial competitive advantages" that would warrant their entering the market. (*Id.* ¶¶ 40–41, 43.) Plaintiffs' theory also presumes that economic damage to ILECs as a result of § 251's requirements is equivalent to financial success on the

part of CLECs. (*Id.* ¶ 39.) Essentially, the logic of plaintiffs' complaint is that the failure of one telephone company to attempt to enter the adjacent territory of another telephone company can only (or at least most logically) be explained by a classic conspiracy to divide territories.

Plaintiffs' assumptions are severely undermined, however, by the fact that being a CLEC in another ILEC's territory is an entirely different business than being an ILEC. An ILEC controls and maintains the telecommunications infrastructure in its territory, offering customers a variety of types of access to that network, such as "voice, fax, or analog modem calls from a residence or business." (Am.Compl.¶ 3.) Thus, ILECs are self-sufficient businesses: they offer services directly to end users at prices that presumably cover their operating costs. Because the nature of telecommunications networks is such that for a competitor to build a duplicate infrastructure in a particular territory would be prohibitively expensive and create precisely the inefficiencies that telecommunications regulation has always sought to avoid, § 251 conceives of CLECs as working on a different business model. CLECs do not maintain their own infrastructure,[3] instead "obtain[ing] access to an incumbent's network." *Iowa Utils. Bd.,* 525 U.S. at 371–72, 119 S.Ct. 721. Thus, a CLEC's business is completely dependent on its relationship with the local ILEC. CLECs are essentially middlemen, buying network time from ILECs at wholesale prices, repackaging it, and selling it for a profit. The extent to which they must depend on the relevant ILEC is demonstrated by plaintiffs' allegations as to the ILECs' wrongdoing with respect to CLECs, in-

---

3. While CLECs may have their own networks, in the way that long-distance carriers have their own networks that allow them to direct calls, CLECs do not possess the physical in- frastructure that allows end users to connect to the exchange networks. (Am. Compl.¶ 47(*l* ).) *See also Trinko,* 305 F.3d at 94.

cluding that "[d]efendants [ILECs] have failed to provide the same quality of service to [CLECs] that [they] provided to their own retail customers," and "have failed to provide access to their operational support systems . . . on a nondiscriminatory basis that places competitors at parity." (Am.Compl.¶ 47.) Thus, the extent to which competing as a CLEC is profitable will depend in substantial part on the terms that can be negotiated with the ILEC, whether the relationship is successful or dispute-ridden, and whether the ILEC fulfills its obligations under § 251.

The difference between being a CLEC and being an ILEC has several implications. First, ILECs who attempt to become CLECs in another ILEC's territory have little competitive advantage over other CLECs. Presumably, the main advantages an ILEC would have over other CLECs in attempting to enter another ILEC's territory as a CLEC are the ILEC's existing infrastructure and its greater ability to invest in new ventures.[4] (Am. Compl. ¶ 23 (discussing ILECs' market power)). Yet an ILEC's market power in its home territory does not translate into market power as a CLEC in another ILEC's territory. An ILEC's infrastructure would not be of great assistance in its entry into a new territory as a CLEC, because § 251 is premised on the assumption that it would be impossible for other companies to compete with ILECs to provide services directly to users. In buying and re-selling these services from the relevant ILEC, ILECs acting as CLECs are in much the same position as other, smaller, CLECs. Thus, the investment involved in becoming a CLEC is the same for Verizon and SBC as it would be for smaller CLECs; all CLECs would have to invest enough in purchasing services from the ILEC to render reselling them profitable. Moreover, while well-known CLECs and ILECs acting as CLECs possess intangible assets such as name recognition and goodwill, these provide competitive advantages only with respect to consumers; because so much of the CLEC's operation is predicated on its relationship with the ILEC, the CLEC cannot easily leverage these assets into its own independent market power. Because of CLECs' necessary dependence on ILECs, an ILEC acting as a CLEC is in substantially the same position, and must undertake the same economic calculus, as any other CLEC.

Second, for much the same reasons, it is not clear that geographical proximity, or the degree to which a territory is surrounded by another ILEC's territory, provides the competitive advantage to an ILEC acting as a CLEC that plaintiffs assume. Since being a CLEC is a different business than being an ILEC, expanding into a new area is not simply a question of expanding one's infrastructure, or using the existing infrastructure to provide the same services in a new location. Thus, a CLEC moving into a new telecommunications territory is unlike, for instance, an ice cream seller moving into a new territory, because an ILEC's ability to sell services as a CLEC in the new territory is not necessarily enhanced by the proximity of its infrastructure. The purchase and resale structure created by § 251 is necessary precisely because it is impossible, and undesirable, for would-be competitors simply to set up their own infrastructure in a new territory and begin directly selling services to users. Even if taking advantage of the option of interconnecting with elements of the ILEC's network may be

---

4. Of course, this may not always be the case, since other CLECs include AT & T, MCI, and Sprint, long-distance companies that have established capital and, presumably, the ability to invest it. *See Trinko*, 305 F.3d at 94 (discussing AT & T's fight to become a CLEC in Verizon's territory).

somewhat easier for a neighboring ILEC acting as a CLEC, the CLEC is still dependent on its relationship with the ILEC for survival; the ILEC–as–CLEC cannot leverage geographical proximity into independence, and therefore is not materially different from a CLEC without a nearby territory of its own.

Because the ILEC–as–CLEC is no different from any other CLEC with respect to its entry into new markets, the question of whether becoming a CLEC is in an ILEC's economic interest must be answered by determining whether competing as a CLEC is, as a general matter, a profitable endeavor. According to plaintiffs themselves, being a CLEC is an extraordinarily difficult enterprise. Plaintiffs assert that ILECs have been obstructionist is providing CLECs with the tools necessary to engage in business: they have sold low quality services to CLECs (*id.* ¶ 47(a)); discriminated in providing access to their operational support systems (*id.* ¶ 47(b)); created "undue delays" in providing unbundled network elements (*id.* ¶ 47(c)); provided low quality interconnection between their networks and the CLECs' (*id.* ¶ 47(e)); and "refused to allow [CLECs] to connect to essential facilities," including telephone lines and switching stations (*id.* ¶ 47(h)). ILECs have also made CLECs' necessary interactions with them extremely difficult, by "impos[ing] slow and inaccurate manual order processing" of CLECs' orders (*id.* ¶ 47(j)), and using "error filled methods to bill [CLECs] in order to discourage competition by making it virtually impossible for [CLECs] to audit the bills the receive[ ]" from the ILECs'(*id.* ¶ 47(i)). Finally, ILECs have allegedly "severely impacted [CLECs'] relationships with customers" by continuing to bill those who switch to CLECs from ILECs' service (*id.* ¶ 47(d)), thereby eroding whatever goodwill a CLEC may have possessed when it entered the market.

According to plaintiffs' own allegations, therefore, it is quite difficult to enter the market as a CLEC, and harder still to make a profit in the face of determined resistance from the ILEC. While plaintiffs assume that, because ILECs have complained that the pricing structure created by the 1996 Act forces them to subsidize CLECs, to their financial disadvantage, ILECs should view becoming CLECs in others' markets as a lucrative opportunity (*id.* ¶ 39), aspects of the regulatory scheme that allegedly have a harmful effect on ILECs do not necessarily translate into easy success for CLECs. Plaintiffs' own factual allegations, which must be accepted as true for purposes of this motion, establish that ILECs have successfully impeded CLECs' using § 251 to create viable business opportunities. Thus, plaintiffs themselves refute their theory that becoming a CLEC is an obviously profitable opportunity for an ILEC.

There is therefore no basis to believe that ILECs would perceive becoming a CLEC as in their economic interests. Plaintiffs' allegations raise the inference that each ILEC is well aware that becoming a CLEC in another market would be extremely difficult in the face of opposition from the local ILEC, because it is using the same tactics against CLECs in its market. Given that each ILEC possesses monopolistic market power in its own territory (*id.* ¶ 47(k)), there is no apparent reason for an ILEC to attempt to push out of its own territory and brave the barriers thrown up by other ILECs. This is especially the case since, as plaintiffs allege, ILECs have been largely successful in keeping CLECs from building viable businesses (*id.* ¶ 47; Pls. Mem. at 2), thus discouraging ILECs, particularly those such as Qwest that are suffering financial

difficulties (Am.Compl. ¶ 43), from wanting to invest much-needed capital in a venture that is likely to fail. Moreover, ILECs have no reason to become CLECs in order to hurt other ILECs by forcing them to sell services at the assertedly confiscatory prices, because the ILECs do not compete with each other in the local telephone services market. (*Id.* ¶ 23.) Thus, Verizon, for example, would have no incentive to spend money simply to wreak economic damage on SBC or the other ILECs.

The statements of Qwest CEO Richard Notebaert, quoted in the Amended Complaint, are not to the contrary. Plaintiffs assert that Notebaert's comment that becoming a CLEC in another ILEC's territory "might be a good way to turn a quick dollar but that doesn't make it right" (*id.* ¶ 42) establishes that not competing as CLECs was contrary to defendants' economic interests. (Pl. Mem. at 9–10.) The Court may consider the entirety of the newspaper article from which plaintiffs drew Notebaert's comment, as well as related articles quoted in the Amended Complaint, because plaintiffs have notice of the documents and have relied on them as evidence of defendants' wrongdoing in bringing suit. *Cortec Industries, Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991).[5] Considered in context, Notebaert's statements suggest only that he did not consider becoming a CLEC to be a sound long-term business plan, because all of the ILECs were challenging § 251 and its pricing structure through litigation, and the legal landscape in which CLECs operate could have changed at any time. (Bradbury Dec. Exs. D, E.) Since prioritizing long-term over short-term economic interest is well within a company's range of rational choices that do not raise suspicions of conspiracy, Notebaert's statements do not support plaintiffs' theory.

Plaintiffs have therefore not alleged facts that suggesting that refraining from competing in other territories as CLECs was contrary to defendants' apparent economic interests, and consequently have not raised an inference that their actions were the result of a conspiracy. For an ILEC to compete as a CLEC in an adjoining ILEC's territory would not be simply to extend their existing business into a neighboring region, but rather would be to invest in undertaking an entirely different kind of business. Given the obstacles to becoming a successful CLEC, defendants' uncontested market power in their own territories, the fact that being a CLEC is a different business model from being an ILEC, defendants' reluctance to branch out into the CLEC market is perfectly consistent with independent decisions that their economic interests were better served by concentrating on their traditional businesses as ILECs, or, for that matter, investing in entirely different enterprises. It is no more surprising, and raises no more inference of concerted action, that the ILECs have not gone into business as CLECs than that they have all collectively failed to enter some other line of business.

Plaintiffs also have not sufficiently alleged that defendants had a strong common motive to conspire. *Apex Oil*, 822 F.2d at 254. Although the Amended Complaint does not explicitly delineate a motive for defendants' alleged territorial allocation agreement, the motive inherent in such an agreement would be that each conspirator would reap greater profits from its respective territory, free of competition, in return for staying out of other territories. Defendants would have no need to agree to collectively refrain from entering each other's territories, however.

5. Moreover, defendants have attached the full text of the cited articles to their motion papers (Bradbury Dec. Exs. D–F), and plaintiffs have not objected.

Since doing so is not simply a matter of expanding an existing infrastructure and business, and entering as a CLEC is allegedly prohibitively difficult, it would be natural for defendants to refrain from competing with each other on their own. Moreover, ILECs have no great incentive to agree to keep each other from threatening their market control in their respective territories, since, as plaintiffs assert (Am. Compl.¶ 47), each ILEC has been successful in thwarting the CLECs in its market, and has no reason to believe that it would be incapable of thwarting other ILECs acting as CLECs as well. Without some motivation that would make conspiring to reach a result far more effective or profitable than allowing natural self-interest to persuade each ILEC independently to reach the same decision, there is no reason to infer a conspiracy. *See Ambook Enter. v. Time Inc.*, 612 F.2d 604, 616 (2d Cir. 1979).

The allegations of plaintiffs' complaint provide no reason to believe that defendants' parallel conduct was reflective of any agreement. The complaint therefore alleges nothing more than parallel conduct that appears to accord with the individual economic interests of the alleged conspirators. Accordingly, plaintiffs have not adequately alleged that defendants violated § 1 of the Sherman Act.[6]

### CONCLUSION

Defendants' motion to dismiss the Complaint is granted. Defendant BellSouth's motion to dismiss for lack of personal jurisdiction is consequently denied as moot. SO ORDERED.

---

6. It is therefore unnecessary to reach defendants' argument that the plaintiffs' damages claims are barred by the filed rate doctrine, or BellSouth's objection to personal jurisdiction.