425 F.3d 99
 William TWOMBLY, individually and on behalf of all others similarly situated and Lawrence Marcus, individually and on behalf of all others similarly situated, Plaintiffs-Appellants,
v.
BELL ATLANTIC CORPORATION, BellSouth Corporation, Qwest Communications International, Inc., SBC Communications Inc. and Verizon Communications Inc., Defendants-Appellees.
 Docket No. 03-9213.
 United States Court of Appeals, Second Circuit.
 Argued: September 15, 2004.
 Decided: October 3, 2005.
 
 COPYRIGHT MATERIAL OMITTED J. Douglas Richards, Milberg Weiss Bershad Hynes & Lerach LLP (Michael M. Buchman, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY; Richard S. Schiffrin, Joseph H. Meltzer, Krishna Narine, Schiffrin & Barroway, LLP, Bala Cynwyd, PA; of counsel), New York, NY, for Plaintiffs-Appellants.
 Mark C. Hansen, Kellogg, Huber, Hansen, Todd & Evans, P.L.L.C. (Michael K. Kellogg, Sean A. Lev, Kellogg, Huber, Hansen, Todd & Evans, P.L.L.C., Washington, DC; Paul K. Mancini, William M. Schur, SBC Communications Inc., San Antonio, TX; John Thorne, Robert J. Zastrow, Verizon Communications Inc., Arlington, VA; Jay P. Lefkowitz, Kirkland & Ellis LLP, New York, NY; Hector Gonzalez, Mayer, Brown, Rowe & Maw LLP, New York, NY; Richard J. Favretto, Miriam R. Nemetz, Mayer, Brown, Rowe & Maw LLP, Washington, DC; J. Henry Walker, Marc W.F. Galonsky, Ashley Watson, BellSouth Corporation, Atlanta, GA; Peter K. Vigeland, Wilmer Cutler Pickering LLP, New York, NY; William J. Kolasky, Wilmer Cutler Pickering LLP, Washington, DC; Timothy M. Boucher, Qwest Communications International, Inc., Denver, CO; of counsel), Washington, DC, for Defendants-Appellees.
 Before: SACK, RAGGI, and HALL, Circuit Judges.
 SACK, Circuit Judge.
 
 
 1
 In an amended complaint filed in the United States District Court for the Southern District of New York, the plaintiffs allege that the defendant telecommunications providers[1] conspired not to compete against one another in their respective geographic markets for local telephone and high-speed Internet services, and to prevent competitors from entering those markets, in violation of Section 1 of the Sherman Act. At the time the complaint was filed, Section 1 provided:
 
 
 2
 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.
 
 
 3
 15 U.S.C. § 1 (2000) (amended 2004).[2] The district court (Gerard E. Lynch, Judge) concluded that the amended complaint fails to allege sufficient facts from which a conspiracy can be inferred and therefore granted the defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.
 
 
 4
 Because we disagree with the standard that the district court applied in reviewing the sufficiency of the plaintiffs' allegations, we vacate its judgment and remand for further proceedings.
 
 BACKGROUND
 
 5
 This case arises in the wake of the Telecommunications Act of 1996, Pub L. No. 104-104, 110 Stat. 56 (codified at scattered sections of Titles 15 and 47 of the United States Code) ("Telecommunications Act" or the "Act"), which was designed to promote competition in the market for local telephone service. Twombly v. Bell Atl. Corp., 313 F.Supp.2d 174, 177 (S.D.N.Y.2003). The Act requires that the defendants — so-called "Baby Bells" or "Incumbent Local Exchange Carriers" ("ILECs"), which were created following the 1984 breakup of the American Telephone & Telegraph Co. ("AT & T") — open their government-sanctioned regional monopolies over local telephone service to competition from so-called "Competitive Local Exchange Carriers" ("CLECs"), including by allowing CLECs to connect their own telephone networks to those of the ILECs, by providing the CLECs with access to the ILECs' network elements for "just, reasonable, and nondiscriminatory" rates, and by allowing the CLECs to purchase the ILECs' telecommunications services at wholesale rates for resale to subscribers. 47 U.S.C. § 251(c); Twombly, 313 F.Supp.2d at 177. In exchange, the Act permits the ILECs to enter the market for long-distance service in which they were prohibited from participating since the breakup of AT & T. 47 U.S.C. § 271; Twombly, 313 F.Supp.2d at 177.
 
 
 6
 The plaintiffs allege that the defendants, motivated by the desire to protect their respective geographic monopolies and otherwise unsustainable profit margins, have resisted the mandate of the 1996 Telecommunications Act by conspiring with one another to keep CLECs from competing successfully in the defendants' respective territories. Twombly, 313 F.Supp.2d at 177-78. The plaintiffs also allege that the defendants, who among them control more than ninety percent of the market for local telephone service in the United States, Amended Complaint ("Am.Compl.") ¶ 48, have agreed not to compete with one another in their respective territories, id. ¶¶ 40-41; Twombly, 313 F.Supp.2d at 178. According to the plaintiffs, the result of this alleged conspiracy has been to drive CLECs out of business, to restrain competition in the market for local telephone and high-speed Internet services, and to injure the plaintiffs by forcing them, as consumers of those services, to pay at rates higher than they would otherwise pay in a competitive environment. Twombly, 313 F.Supp.2d at 178.
 
 
 7
 The amended complaint alleges several factual bases for its far-reaching claims of a two-pronged antitrust conspiracy.
 
 
 Agreement Not to Compete
 
 
 8
 As an initial matter, the plaintiffs allege "parallel conduct" on the part of the ILECs in not competing with each other, which they assert "would be anomalous in the absence of an agreement . . . not to compete." Am. Compl. ¶ 40. Specifically, they allege that for various historical reasons, the defendants' respective service territories are not entirely contiguous, with some of the defendants serving pockets of territory that are entirely surrounded by the territories of their supposed competitors. Id. ¶¶ 40-41. For example, according to the allegations, defendant SBC serves most of the State of Connecticut, even though defendant Verizon serves the surrounding northeastern states, and SBC also serves California and Nevada, even though defendant Qwest serves the surrounding western states. Id. ¶ 40. Similarly, Verizon serves many small patches of territory in various western and midwestern states that are otherwise primarily served by SBC. Id. While the plaintiffs contend that these geographic anomalies should provide Verizon and Qwest with "substantial competitive advantages" in competing with SBC for business in Connecticut, and California and Nevada, respectively, and SBC with similar advantages in competing with Verizon in the west and midwest, none of those companies has sought to compete with the others "in a meaningful manner." Id. ¶ 41. The plaintiffs deem this to be a situation that would be "unlikely" absent an agreement not to compete. Id. They suggest that this result is especially odd in that the defendants have publicly complained that the Telecommunications Act hurts their businesses by forcing them to provide CLECs with access to their networks at rates that are below the cost of maintaining those networks. Id. ¶ 39. By this same economic logic, the plaintiffs argue, the ILECs should be scrambling to compete with one another as CLECs, thereby benefitting from inexpensive access to their competitors' networks. Id.
 
 
 9
 The plaintiffs also point to a statement allegedly made by Richard Notebaert, the current Chief Executive Officer of defendant Qwest and the former Chief Executive Officer of Ameritech Corp., which merged with defendant SBC in 1999. Id. ¶ 42. In a newspaper article published in October 2002, Notebaert was quoted as saying that for Qwest, competing in the territory of SBC/Ameritech "might be a good way to turn a quick dollar but that doesn't make it right." Id. (quoting Jon Van, Ameritech Customers Off Limits: Notebaert, Chi. Trib., Oct. 31, 2001, at Business 1). According to the plaintiffs, that statement, coming at a time when Qwest's revenues were declining and it was losing money, constituted an admission of collusive conduct among the ILECs. Id. ¶¶ 42-44.
 
 
 10
 And the plaintiffs point to a letter from two members of the House of Representatives to then-Attorney General John Ashcroft requesting that the Department of Justice investigate the extent to which the Baby Bells' "very apparent non-competition policy in each others' markets is coordinated." Id. ¶ 45 (quoting Letter from Rep. John Conyers Jr. and Rep. Zoe Lofgren to Att'y Gen. John D. Ashcroft (Dec. 18, 2002)).
 
 
 11
 In addition, the plaintiffs assert that the defendants communicate frequently with one another "through a myriad of organizations," providing an opportunity for a conspiracy to form and be conducted without the likelihood of detection. Id. ¶ 46. At the same time, they assert that "[t]he structure of the market for local telephone services is such as to make a market allocation agreement feasible" even in the absence of frequent communications, in part because "[i]f one of the [d]efendants had broken ranks and commenced competition in another's territory the others would quickly have discovered that fact." Id. ¶¶ 48-49.
 
 
 12
 
 Agreement to Prevent CLECs from Competing Successfully
 
 
 
 13
 The plaintiffs further allege that from the day of the Telecommunications Act's enactment until the present, the defendants have sought to interfere with the ability of CLECs to compete successfully, including by negotiating "unfair agreements" with CLECs for access to the ILECs' telephone networks, by providing CLECs with poor quality connections to those networks, and by interfering with the CLECs' relationships with the CLECs' own customers, such as by continuing to bill customers even after they have entered agreements for services with CLECs. Twombly, 313 F.Supp.2d at 177-78; Am. Compl. ¶¶ 47, 64.
 
 
 14
 The plaintiffs cite a report by a consumer group, the Consumer Federation of America ("CFA"), which suggested that the defendants "`have refused to open their markets by dragging their feet in allowing competitors to interconnect, refusing to negotiate in good faith, litigating every nook and cranny of the law, and avoiding head-to-head competition like the plague.'" Id. ¶ 47 (quoting Consumer Fed'n of Am., Lessons From 1996 Telecommunications Act: Deregulation Before Meaningful Competition Spells Consumer Disaster 1 (Feb.2001)).
 
 
 15
 The plaintiffs allege that the defendants share a common motivation for their behavior in preventing the CLECs from competing because, were any one of the ILECs to allow meaningful competition in the geographic area it controls, "the resulting greater competitive inroads into that [d]efendant's territory would [reveal] the degree to which competitive entry by CLECs would [be] successful in the other territories in the absence of such conduct." Am. Compl. ¶ 50. Moreover, they contend, "the greater success of any CLEC that made substantial competitive inroads into one [d]efendant's territory would [enhance] the likelihood that such a CLEC might present a competitive threat in other [d]efendants' territories as well." Id.
 
 
 The District Court's Decision
 
 
 16
 In dismissing the plaintiffs' amended complaint, the district court concluded that the allegations of "conscious parallelism" of the defendants' actions, taken by themselves, are not sufficiently probative, on a motion to dismiss, of conspiratorial intentions that would support a finding of antitrust-law violations. Twombly, 313 F.Supp.2d at 179-82, 184, 189. Instead, applying this Circuit's case law with respect to Sherman Act claims at the summary judgment stage, the court required the plaintiffs to "establish[ ] at least one `plus factor' that tends to exclude independent self-interested conduct as an explanation for defendants' parallel behavior." Id. at 179. Such a factor, the court noted, could be, for example, "evidence that the parallel behavior would have been against individual defendants' economic interests absent an agreement, or that defendants possessed a strong common motive to conspire." Id. (citing Apex Oil Co. v. DiMauro, 822 F.2d 246, 253-54 (2d Cir.1987), cert. denied, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987), and cert. denied sub nom. Coastal Corp. v. Apex Oil Co., 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987)). While acknowledging that applying this standard in the context of a motion to dismiss "is somewhat in tension with Fed.R.Civ.P. 8, which requires only a `short and plain statement of the claim,'" id. at 180 (quoting Fed.R.Civ.P. 8), the court concluded that such a standard is nonetheless appropriate for two reasons. First, it wrote, insofar as parallel behavior by competing companies is not itself illegal absent an agreement to restrain trade, "the doctrine of conscious parallelism [would] allow[ ] plaintiffs to state a claim by alleging conduct that is, in itself, not prohibited by § 1 of the Sherman Act." Id. at 181. Accordingly, the court concluded, "allowing simple allegations of parallel conduct to entitle plaintiffs to discovery circumvents both § 1's requirement of a conspiracy and Rule 8's requirement that complaints state claims on which relief can be granted." Id. Second, the court continued, "allegations of plus factors are necessary to give defendants notice of plaintiff's theory of the conspiracy." Id. "[T]here is simply no way to defend against such a claim without having some idea of how and why the defendants are alleged to have conspired." Id.
 
 
 17
 Applying that standard, the court concluded that the plaintiffs fail to allege facts "suspicious enough to suggest that defendants are acting pursuant to a mutual agreement rather than their own individual self-interest." Id. at 182. First, given the ILECs' stated opposition to the pricing structure imposed by the Telecommunications Act, the court wrote, their "parallel action" to "attempt to discourage CLECs from entering the market and to render it difficult for them to survive once they had entered . . . does not naturally give rise to an inference of an agreement, since the behavior of each ILEC in resisting the incursion of CLECs is fully explained by the ILEC's own interests in defending its individual territory." Id. at 183.
 
 
 18
 Second, the district court also rejected the plaintiffs' claim that the defendants conspired not to compete against one another in their respective markets even though such behavior might have been financially advantageous to them in the short term. The court suggested that the plaintiffs' theory of the case erroneously assumes that operating a telephone business as an ILEC is substantially similar to operating a telephone business as a CLEC in territory controlled by another company. Id. at 185. In fact, the court wrote, the two businesses are "entirely different"; while ILECs are "self-sufficient," CLECs are "completely dependent" on their contractual relationships with the ILECs in whose territories they operate. Id. As a result, "an ILEC's market power in its home territory does not translate into market power as a CLEC in another ILEC's territory," such that "ILECs acting as CLECs are in much the same position as other, smaller, CLECs." Id. at 186. Even brand recognition and geographic proximity do not help, the court wrote, because the ILEC competing as a CLEC "is still dependent on its relationship with the [local] ILEC for survival." Id. at 186-87.
 
 
 19
 Moreover, the court noted, the plaintiffs' own allegations of how difficult it is to operate a successful CLEC cast doubt on their assertion that ILECs should be expected to attempt to compete with one another as CLECs in their respective territories. Id. at 187. "Plaintiffs' allegations raise the inference that each ILEC is well aware that becoming a CLEC in another market would be extremely difficult in the face of opposition from the local ILEC, because it is using the same tactics against CLECs in its market." Id. Accordingly, "there is no apparent reason for an ILEC to attempt to push out of its own territory and brave the barriers thrown up by other ILECs." Id.
 
 
 20
 Finally, the court rejected the plaintiffs' contention that the statement by Qwest CEO Notebaert in any way suggests collusion among the defendants. Id. at 188. "Considered in context," the court reasoned, "Notebaert's statement[ ] suggest[ed] only that he did not consider becoming a CLEC to be a sound long-term business plan, because all of the ILECs were challenging [47 U.S.C.] § 251 and its pricing structure through litigation, and the legal landscape in which CLECs operate could have changed at any time." Id.
 
 
 21
 The district court therefore granted the defendants' motion to dismiss the plaintiffs' complaint in its entirety. Id. at 189. The plaintiffs appeal.
 
 DISCUSSION
 
 22
 On appeal, the plaintiffs argue principally that the district court erred by applying, on a motion to dismiss, a heightened, "plus factors" standard of pleading ordinarily applicable as the standard of proof at the summary judgment and trial stages. In addition, the plaintiffs contend that even were there a "plus factors" pleading requirement, the district court erred in applying that standard by not accepting all of the plaintiffs' allegations as true and by not drawing all inferences in their favor. Because we conclude that the district court applied an incorrect standard for evaluating the defendants' motion to dismiss, we need not, and therefore do not, reach the plaintiffs' second argument.
 
 I. Standard of Review
 
 23
 We review de novo the dismissal of a complaint for failure to state a claim, accepting as true all facts alleged in the complaint and drawing all inferences in favor of the plaintiff. Todd v. Exxon Corp., 275 F.3d 191, 197 (2d Cir.2001). "A complaint should not be dismissed for failure to state a claim `unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Id. at 197-98 (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "At the pleading stage . . . the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177 (2d Cir.2004) (citation, brackets, and internal quotation marks omitted).
 
 II. The Notice Pleading Standard
 
 A. General Principles
 
 Fed.R.Civ.P. 11(b) provides:
 
 24
 By presenting to the court . . . a pleading . . . an attorney. . . is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, [the pleading is presented for a proper purpose, and] —
 
 
 25
 . . . .
 
 
 26
 (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
 
 
 27
 (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery. . . .
 
 
 28
 Id. At least in theory, then, when a complaint is filed by counsel, it arrives at the door of the district court with the warrant of counsel that "allegations and other factual contentions" contained in the complaint "have evidentiary support or, if specifically so identified" — presumably by being stated as being "to the best of [his or her] knowledge, information, and belief" — "are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Id. 11(b)(3).
 
 
 29
 As for the contents of the complaint, Rule 8(a) provides only that it "shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends . . ., (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks." Fed.R.Civ.P. 8(a); see also id., Rule 8(e)(1) ("Each averment of a pleading shall be simple, concise, and direct."). As the Supreme Court recognized nearly half a century ago, the Rules thus set forth a pleading standard under which plaintiffs are required to "give the defendant fair notice of what the. . . claim is and the grounds upon which it rests." Conley, 355 U.S. at 47, 78 S.Ct. 99. "Fair notice" is "that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so that it may be assigned the proper form of trial." Simmons v. Abruzzo, 49 F.3d 83, 86 (2d Cir.1995) (citation and internal quotation marks omitted). The complaint thus need not "set out in detail the facts upon which" the claim is based. Conley, 355 U.S. at 47, 78 S.Ct. 99.
 
 
 30
 "[T]he purpose of pleading is to facilitate a proper decision on the merits," Conley, 355 U.S. at 48, 78 S.Ct. 99, and not simply to screen out complaints based on a lack of artful lawyering before any facts have been discovered, id. "[O]rdinary pleading rules are not meant to impose a great burden upon a plaintiff." Dura Pharms., Inc. v. Broudo, ___ U.S. ___, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005); see also Fed.R.Civ.P. 8(f) ("All pleadings shall be so construed as to do substantial justice.").
 
 
 B. Heightened Pleading Standards
 
 
 31
 The Rules do establish more demanding pleading requirements for certain kinds of claims. See, e.g., Fed.R.Civ.P. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."). But as the language of Rule 9 makes clear, and as the Supreme Court has recently confirmed, instances requiring such particularized pleading are narrowly circumscribed by the Rules. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 513, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions."). Antitrust actions are not among those exceptions.
 
 
 32
 In Swierkiewicz, the Supreme Court noted that it had previously "declined to extend" heightened pleading requirements to "other contexts" beyond "fraud or mistake." Id. (citing Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993)); see also Leatherman, 507 U.S. at 168, 113 S.Ct. 1160 (noting that while "the Federal Rules do address in Rule 9(b) the question of the need for greater particularity in pleading certain actions, [they] do not include among the enumerated actions any reference to complaints alleging municipal liability under § 1983[, and] [e]xpressio unius est exclusio alterius"). The Swierkiewicz Court unanimously reaffirmed that approach with respect to the allegations of employment discrimination before it. See Swierkiewicz, 534 U.S. at 513, 122 S.Ct. 992 ("[C]omplaints in these cases, as in most others, must satisfy only the simple requirements of Rule 8(a)."). "A requirement of greater specificity for particular claims is a result that `must be obtained by the process of amending the Federal Rules, and not by judicial interpretation.'" Id. at 515, 122 S.Ct. 992 (quoting Leatherman, 507 U.S. at 168, 113 S.Ct. 1160). Echoing Conley, the Court explained that "[t]he liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim." Id. at 514, 122 S.Ct. 992.
 
 
 33
 Our recent opinion in Wynder v. McMahon, 360 F.3d 73 (2d Cir.2004), a race discrimination case, is instructive. The district court had "impos[ed] specific conditions on the form and content of" a complaint beyond those required by Rule 8(a). Id. at 74. We held that to have been improper. We said:
 
 
 34
 It is hardly debatable that the district court's order called for the plaintiff to supply a complaint that substantially exceeded the requirements of Rule 8. Under Swierkiewicz, Rule 8 pleading is extremely permissive. 534 U.S. at 512-13, 122 S.Ct. 992. As the Supreme Court there noted, Rule 8(a)(2) provides (a) that a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief," and (b) that such a statement simply "`give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" 534 U.S. at 512, 122 S.Ct. 992 (quoting Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).[3] In the case before us, the district court demanded far more than a short and plain statement of the claims and the grounds upon which they rest.
 
 
 35
 Id. at 77. We went on to conclude that the plaintiff's pleading, however imperfect, had satisfied the permissive standard of Rule 8, rightly understood.
 
 
 36
 In the case before us, plaintiff's submission is a model of neither clarity nor brevity, and we can sympathize with the district court's displeasure with it, but it is sufficient to put the defendants on fair notice. In Simmons, we defined fair notice as "that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so that it may be assigned the proper form of trial." 49 F.3d at 86 (internal quotation marks omitted); see also Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir.1988) (fair notice is judged by whether the complaint enables defendants "to answer and prepare for trial"). [The plaintiff's] complaint, at its core, achieves these ends.
 
 
 37
 Id. at 79. We therefore vacated the district court's dismissal and remanded for further proceedings.
 
 
 C. Heightened Pleading in Antitrust Cases
 
 
 38
 Antitrust claims are, for pleading purposes, no different. We have consistently rejected the argument — put forward by successive generations of lawyers representing clients defending against civil antitrust claims — that antitrust complaints merit a more rigorous pleading standard, whether because of their typical complexity and sometimes amorphous nature, or because of the related extraordinary burdens that litigation beyond the pleading stage may place on defendants and the courts. See Todd, 275 F.3d at 198 ("No heightened pleading requirements apply in antitrust cases."); George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp., 554 F.2d 551, 553-54 (2d Cir.1977) (rejecting the argument that "antitrust claims, because of their complexity, must be pleaded with greater specificity than other claims," and concluding that "a short plain statement of a claim for relief which gives notice to the opposing party is all that is necessary in antitrust cases, as in other cases under the Federal Rules. . . [;][t]he discovery process is designed to provide whatever additional sharpening of the issues may be necessary"); Nagler v. Admiral Corp., 248 F.2d 319, 322-23 (2d Cir.1957) (noting that "[i]t is true that antitrust litigation may be of wide scope and without a central point of attack, so that defense must be diffuse, prolonged, and costly," and that "many defense lawyers have strongly advocated more particularized pleading in this area of litigation," but concluding that "it is quite clear that the federal rules contain no special exceptions for antitrust cases"). Indeed, it has been argued from time to time that antitrust cases are less suitable candidates for dismissal at the pleading stage than some other kinds of litigation because evidence of the claimed illegality is likely to be in the exclusive control of the defendants. See Hosp. Bldg. Co. v. Trs. of Rex Hosp., 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) ("[I]n antitrust cases, where `the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." (quoting Poller v. Columbia Broad. Sys., Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962))).
 
 
 39
 True, we have said that "[a]lthough the Federal Rules permit statement of ultimate facts, a bare bones statement of conspiracy or of injury under the antitrust laws without any supporting facts permits dismissal." Heart Disease Research Found. v. Gen. Motors Corp., 463 F.2d 98, 100 (2d Cir.1972); see also Klebanow v. N.Y. Produce Exch., 344 F.2d 294, 299 (2d Cir.1965) ("A mere allegation that defendants violated the antitrust laws as to a particular plaintiff and commodity no more complies with Rule 8 than an allegation which says only that a defendant made an undescribed contract with the plaintiff and breached it, or that a defendant owns a car and injured plaintiff by driving it negligently."). "[M]inimal requirements are not tantamount to nonexistent requirements." Gooley v. Mobil Oil Corp., 851 F.2d 513, 514 (1st Cir.1988).
 
 
 40
 In Klebanow, for example, we rejected as insufficient a complaint that alleged simply that the defendants had engaged "in an illegal contract combination and conspiracy with others, unknown to the plaintiffs, to restrain and monopolize trade in, and to fix the price of, cottonseed oil," causing damages in excess of $11 million. Klebanow, 344 F.2d at 296 (internal quotation marks omitted). Judge Friendly, writing for the Court, noted that the complaint "furnishe[d] not the slightest clue as to what conduct by the defendants is claimed to constitute `an illegal contract combination and conspiracy.'" Id. at 299.[4]
 
 
 41
 But in United States v. Employing Plasterers' Ass'n, 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618 (1954), the Supreme Court considered a complaint in a civil action brought by the federal government against a trade association, a labor union, and the union's president. Between them, the defendants were responsible for some sixty percent of the Chicago-area plastering contracting market. Id. at 187, 74 S.Ct. 452. The government alleged that the defendants had violated Section 1 by "act[ing] in concert to suppress competition among local plastering contractors, . . . prevent[ing] out-of-state contractors from doing any business in the Chicago area and . . . bar[ring] entry of new local contractors without approval by a private examining board set up by the union." Id. at 188, 74 S.Ct. 452. "The effect of all this," according to the government, was "an unlawful and unreasonable restraint of the flow in interstate commerce of materials used in the Chicago plastering industry." Id. The district court dismissed the complaint, concluding "that there was no allegation of fact which showed that these powerful local restraints had a sufficiently adverse effect on the flow of plastering materials into Illinois." Id.
 
 
 42
 The Supreme Court disagreed, noting that "the complaint alleged that continuously [for more than a decade] a local group of people were to a large extent able to dictate who could and who could not buy plastering materials that had to reach Illinois through interstate trade if they reached there at all." Id. at 189, 74 S.Ct. 452. The Court continued:
 
 
 43
 Under such circumstances it goes too far to say that the Government could not possibly produce enough evidence to show that these local restraints caused unreasonable burdens on the free and uninterrupted flow of plastering materials into Illinois. . . .
 
 
 44
 The Government's complaint may be too long and too detailed in view of the modern practice looking to simplicity and reasonable brevity in pleading. It does not charge too little. It includes every essential to show a violation of the Sherman Act. And where a bona fide complaint is filed that charges every element necessary to recover, summary dismissal of a civil case for failure to set out evidential facts can seldom be justified.
 
 
 45
 
 Id.
 
 
 
 46
 Three years later, the Court again emphasized the limited factual proffer required to satisfy the pleading requirement in a Section 1 case. It noted in Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957), that "[t]he test as to sufficiency laid down by Mr. Justice Holmes . . . is whether `the claim is wholly frivolous,'" id. at 453, 77 S.Ct. 390 (quoting Hart v. B.F. Keith Vaudeville Exchange, 262 U.S. 271, 274, 43 S.Ct. 540, 67 L.Ed. 977 (1923)). Although the Court acknowledged that "the complaint might have been more precise in its allegations concerning the purpose and effect of the conspiracy," it concluded: "`[W]e are not prepared to say that nothing can be extracted from this bill that falls under the act of Congress.'" Id. (quoting Hart, 262 U.S. at 274, 43 S.Ct. 540).
 
 
 47
 Less than eight months later, we cautioned against extensive antitrust pleading in which unnecessary details "double the bulk without increasing enlightenment." Nagler, 248 F.2d at 325. Describing the plaintiffs' complaint as an "imposing document consisting of twelve or more printed pages," id. at 324, we said that we "must look beyond the mere mountain of words to the meaning sought to be conveyed," id. at 325. "So looking," we concluded, "we can have no doubt that plaintiffs say the supplier defendants have given their favored customers . . . price discounts and other special favors (listed in some detail) which have lost sales to the plaintiffs, destroyed their capacity to compete, and forced some of them out of business." Id. While noting that the complaint did "lack a direct allegation that the defendants conspired together," we said that "as to this the trier of facts may draw an inference of agreement or concerted action from the `conscious parallelism' of the defendants' acts of price cutting and the like." Id. Accordingly, we reversed the district court's dismissal of the complaint, concluding that the complaint should not "be burdened with possibly hundreds of specific instances" of the antitrust violations alleged. Id. at 326. "[S]uch pleading of the evidence is surely not required and is on the whole undesirable." Id. "It is a matter for the discovery process, not for allegations of detail in the complaint." Id.
 
 
 48
 The factual predicate that is pleaded does need to include conspiracy among the realm of plausible[5] possibilities. See, e.g., Todd, 275 F.3d at 200 ("To survive a Rule 12(b)(6) motion to dismiss [in a Section 1 case], an alleged product market must [inter alia] . . . be `plausible.'" (citing Hack v. President & Fellows of Yale Coll., 237 F.3d 81, 86 (2d Cir.2000), cert. denied, 534 U.S. 888, 122 S.Ct. 201, 151 L.Ed.2d 142 (2001))); see also DM Research, Inc. v. College of American Pathologists, 170 F.3d 53, 56 (1st Cir.1999) (affirming dismissal where, "without more detail, it is highly implausible to suppose that [one of the defendants] or its members ha[d] any reason to `agree' with" the other defendant unlawfully); TV Communications Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1026 (10th Cir.1992) (dismissing antitrust complaint in part on the basis of the implausibility of the conspiracy alleged); cf. Asahi Glass Co., Ltd. v. Pentech Pharms., Inc., 289 F.Supp.2d 986, 995 (N.D.Ill.2003) (Posner, J., sitting by designation) ("[S]ome threshold of plausibility must be crossed at the outset before a patent antitrust case should be permitted to go into its inevitably costly and protracted discovery phase."). If a pleaded conspiracy is implausible on the basis of the facts as pleaded — if the allegations amount to no more than "unlikely speculations" — the complaint will be dismissed. DM Research, 170 F.3d at 56. But short of the extremes of "bare bones" and "implausibility," a complaint in an antitrust case need only contain the "short and plain statement of the claim showing that the pleader is entitled to relief" that Rule 8(a) requires.
 
 
 49
 We tackled this issue in the Section 1 context in Discon, Inc. v. NYNEX Corp., 93 F.3d 1055 (2d Cir.1996), vacated on other grounds, 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998). Our analysis of the complaint under review began,
 
 
 50
 In this case, we believe that the District Court may have been misled by a poorly drafted complaint into categorizing the arrangement as one that is presumptively legal. Since the complaint may properly be understood to allege arrangements that might be shown to be unlawful, we are obliged to reverse in part and remand. We believe that the complaint states a cause of action under Section One of the Sherman Act. . . .
 
 
 51
 Id. at 1059.
 
 We continued:
 
 52
 To state a claim under Section One of the Sherman Act, [the plaintiff] must allege (1) that the NYNEX Defendants entered into a contract, combination, or conspiracy, and (2) that their agreement was in restraint of trade. See 15 U.S.C. § 1.
 
 Id. And then, by way of footnote, we said:
 
 53
 The NYNEX Defendants devote a single footnote in their brief to the argument that [the plaintiff] failed to allege a "conspiracy" in restraint of trade. Although [the plaintiff's] complaint is not a model of clarity, it alleges that NYNEX, MECo, and AT & T Technologies conspired to defraud the rate-paying public and that this agreement apparently contemplated some form of discrimination against [the plaintiff]. More specifically, the complaint alleges the existence of various meetings between NYNEX procurement personnel, MECo officers, and agents of AT & T Technologies. These allegations are sufficient to defeat a motion to dismiss.
 
 
 54
 Id., n. 3 (citation omitted). The Supreme Court reversed, NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998), but on the grounds that the legal theory underlying the asserted cause of action was incorrect, not that the factual allegations contained in the complaint were otherwise insufficient.[6]
 
 
 55
 While these decisions do not offer a bright-line rule for identifying the factual allegations required to state an antitrust claim, they suggest that the burden is relatively modest. The requirements of Rule 8 "notice pleading" as applied to claims under Section 1 of the Sherman Act remain relatively straightforward. Section 1 proscribes "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. Interpreting this prohibition, the Supreme Court "has long recognized that Congress intended to outlaw only unreasonable restraints." State Oil Co. v. Khan, 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997).[7] As a general matter, then, a Section 1 plaintiff must allege that (1) the defendants were involved in a contract, combination, or conspiracy that (2) operated unreasonably to restrain interstate trade, together with the factual predicate upon which those assertions are made. See Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 95-96 (2d Cir.1998); Discon, Inc., 93 F.3d at 1059.[8]
 
 III. "Plus Factors" at the Pleading Stage
 
 A. On Summary Judgment
 
 
 56
 A plaintiff's claim, under the ordinarily applicable standard, will not survive a defendant's motion for summary judgment — a stage that this litigation has, of course, yet to reach — "[w]here the record taken as a whole could not lead a rational trier of fact to find for the [plaintiff on that claim]." Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) In making this determination, all "`inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the [plaintiff].'" Id. (quoting United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam)) (alteration in original). In a case brought under Section 1 of the Sherman Act, however, "the range of permissible inferences from ambiguous evidence" is limited, id. at 588, 106 S.Ct. 1348, because antitrust laws prohibit only contracts, combinations, or conspiracies — and not independent parallel conduct — that operate unreasonably to restrain trade, see Apex Oil, 822 F.2d at 253. Although "[p]arallel conduct can be probative evidence bearing on the issue of whether there is an antitrust conspiracy," id., it may also, as the district court in the instant case pointed out, "simply [be] the result of similar decisions by competitors who have the same information and the same basic economic interests," Twombly, 313 F.Supp.2d at 181. Accordingly, in a Section 1 case where there is no "direct, `smoking gun' evidence," Todd, 275 F.3d at 198,
 
 
 57
 conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence `that tends to exclude the possibility' that the alleged conspirators acted independently.
 
 
 58
 Matsushita, 475 U.S. at 588, 106 S.Ct. 1348 (quoting Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) (citations omitted, emphasis added)). Thus, on a motion for summary judgment in a case involving alleged violations of Section 1, "courts have held that a plaintiff must show the existence of additional circumstances, often referred to as `plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy." Apex Oil, 822 F.2d at 253. These "plus factors" may include: "a common motive to conspire," id. at 254, evidence that "shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators," id. (citation and internal quotation marks omitted), and evidence of "a high level of interfirm communications," id.; accord Todd, 275 F.3d at 198.
 
 
 59
 
 B. On Motion to Dismiss.
 
 
 
 60
 We are reviewing the grant of a motion to dismiss, not the grant of a motion for summary judgment, however. To survive a motion to dismiss, as we have explained, an antitrust claimant must allege only the existence of a conspiracy and a sufficient supporting factual predicate on which that allegation is based.
 
 
 61
 As discussed in part II.C. of this opinion, the pleaded factual predicate must include conspiracy among the realm of "plausible" possibilities in order to survive a motion to dismiss. Nagler suggests that a pleading of facts indicating parallel conduct by the defendants can suffice to state a plausible claim of conspiracy. Nagler, 248 F.2d at 325. Thus, to rule that allegations of parallel anticompetitive conduct fail to support a plausible conspiracy claim, a court would have to conclude that there is no set of facts that would permit a plaintiff to demonstrate that the particular parallelism asserted was the product of collusion rather than coincidence. Of course, if a plaintiff can plead facts in addition to parallelism to support an inference of collusion — what we have referred to above as "plus factors" at the summary judgment stage — that only strengthens the plausibility of the conspiracy pleading. But plus factors are not required to be pleaded to permit an antitrust claim based on parallel conduct to survive dismissal. Of course, as we have explained in the previous section of this opinion, after discovery, a plaintiff confronting a summary judgment motion is required to adduce admissible evidence of "plus factors" if it seeks to have the trier of fact infer an unlawful conspiracy in restraint of trade from consciously parallel conduct.
 
 
 62
 We cannot know at the pleading stage whether the plaintiffs here will seek to rely on such an inference from parallelism based on "plus factors" or not. But there is no reason we can perceive to require the plaintiffs to include allegations of "plus factors" in their complaint, since they may not be required to establish "plus factors" at trial — if, for example, they can prove conspiracy directly.[9]
 
 
 63
 We acknowledge that district courts have occasionally elided the distinction between the standard applicable to Rule 12(b)(6) and Rule 56 motions on the basis of a well-founded concern that to do otherwise would be to condemn defendants to potentially limitless "fishing expeditions"[10] — discovery pursued just "in case anything turn[s] up"[11] — in hopes, perhaps, of a favorable settlement in any event. In several recent cases, including this one, district courts have dismissed Sherman Act complaints because they did not contain substantial allegations of facts beyond "conscious parallelism" sufficient to support an inference that the defendants' actions were more likely than not conspiratorial. See Twombly, 313 F.Supp.2d at 180 ("In the context of parallel conduct allegations, simply stating that defendants engaged in parallel conduct, and that this parallelism must have been due to an agreement, would be equivalent to a conclusory, `bare bones' allegation of conspiracy."); see also Kramer v. Pollock-Krasner Found., 890 F.Supp. 250, 256 (S.D.N.Y.1995) (dismissing a Sherman Act claim "for failure to allege a sufficient factual basis," because "the defendants' allegedly conspiratorial actions could equally have been prompted by lawful, independent goals which do not constitute a conspiracy"); Yellow Page Solutions, Inc. v. Bell Atl. Yellow Pages Co., No. 00 CIV. 5663, 2001 WL 1468168, at *14, 2001 U.S. Dist. LEXIS 18831, at *42 (S.D.N.Y. Nov.19, 2001) (dismissing a Sherman Act complaint for failure to state a claim because "uniformity does not permit an inference of a conspiracy where the conduct is in each party's individual self-interest"). But cf. Levitch v. Columbia Broad. Sys., Inc., 495 F.Supp. 649, 675 (S.D.N.Y.1980) (dismissing a Sherman Act claim because "in order to state a valid claim under § 1, a plaintiff must, at a minimum, allege how [the defendants'] decisions are interdependent by at least suggesting that there is some reason to believe that the defendants were committed to a common end"), aff'd, 697 F.2d 495 (2d Cir.1983). As the district court in the instant case accurately stated: "While the Second Circuit's case law on parallel conduct conspiracies has developed mainly in the context of summary judgment, district courts have required that plaintiffs allege plus factors in order to withstand motions to dismiss as well." Twombly, 313 F.Supp.2d at 179-80.
 
 
 64
 The district court viewed the requirement that Section 1 plaintiffs plead "plus factors" as sensible because antitrust laws do not prohibit parallel conduct and because "the defendants [need] notice of plaintiff[s'] theory of the conspiracy." Id. at 181. To these considerations, the defendants add a third on appeal: the fear that, unless antitrust plaintiffs are required to plead "plus factors," "any claim asserting parallel conduct [will] survive a motion to dismiss." Appellees' Br. at 29. Without a heightened pleading requirement, the defendants predict, "[a]ntitrust cases [will] clog the courts for years, cost defendants millions of dollars to defend, and . . . threaten to reward plaintiffs' attorneys for bringing meritless claims." Id. at 29-30.
 
 
 65
 We are not unsympathetic to these concerns, but we find the arguments based on them ultimately unconvincing. At the pleading stage, we are concerned only with whether the defendants have "fair notice" of the claim, and the conspiracy that is alleged as part of the claim, against them — that is, enough to "enable [the defendants] to[, inter alia,] answer and prepare for trial," Simmons, 49 F.3d at 86 — not with whether the conspiracy can be established at trial.
 
 
 66
 The Nagler Court admonished that while an antitrust defense will often prove "diffuse, prolonged, and costly," Nagler, 248 F.2d at 322, the remedy to that problem is not to be found in abandoning the rules of notice pleading and raising the bar on plaintiffs in the absence of a legislative mandate to do so. "[A] considerable part of federal litigation is of a lengthy and burdensome nature and we are not justified in frowning on a Congressional policy so definitely cherished as is [that expressed by 15 U.S.C. § 1]." Id. at 326. Thus, in a regime that contemplates the enforcement of antitrust laws in large measure by private litigants, although litigation to summary judgment and beyond may place substantial financial and other burdens on the defendants, neither the Federal Rules nor the Supreme Court has placed on plaintiffs the requirement that they plead with special particularity the details of the conspiracies whose existence they allege. Cf. Radovich, 352 U.S. at 453-54, 77 S.Ct. 390 (noting that Congress "has provided sanctions allowing private enforcement of the antitrust laws by an aggrieved party," and that "[i]n the face of such a policy this Court should not add requirements to burden the private litigant beyond what is specifically set forth by Congress in those laws").[12]
 
 
 67
 We are mindful that a balance is being struck here, that on one side of that balance is the sometimes colossal expense of undergoing discovery, that such costs themselves likely lead defendants to pay plaintiffs to settle what would ultimately be shown to be meritless claims, that the success of such meritless claims encourages others to be brought, and that the overall result may well be a burden on the courts and a deleterious effect on the manner in which and efficiency with which business is conducted. If that balance is to be re-calibrated, however, it is Congress or the Supreme Court that must do so.[13] See Swierkiewicz, 534 U.S. at 515, 122 S.Ct. 992 ("A requirement of greater specificity for particular claims is a result that must be obtained by the process of amending the Federal Rules, and not by judicial interpretation." (internal quotation marks and citation omitted)).
 
 
 68
 IV. Applying the Notice Pleading Standard to This Appeal
 
 
 69
 Accepting as true the facts alleged in the amended complaint, which are described at some length in the Background section of this opinion, above, and drawing all inferences in favor of the plaintiffs, we conclude that the plaintiffs have satisfied their burden at the pleading stage.
 
 
 70
 As the district court pointed out, to support their single claim of a conspiracy under Section 1 of the Sherman Act, the plaintiffs allege an agreement to employ two anticompetitive tactics to maintain their respective monopoly control over discrete geographic markets. Twombly, 313 F.Supp.2d at 182. Pursuant to the first tactic, the defendants allegedly conspired "to collectively keep CLECs from successfully entering [the defendants' respective] markets." Id. Pursuant to the other, they allegedly agreed "to refrain from attempting to enter each other's markets as CLECs." Id.
 
 
 71
 The amended complaint alleges that the conspiracy began on February 6, 1996, around the time the Telecommunications Act became law, and has continued to the present day. Am. Compl. ¶ 64. It further alleges that the defendants together control more than ninety percent of the market for local telephone service in the continental United States, id. ¶ 48, and that they, together with other, unnamed "persons, firms, corporations and associations," engaged in the conspiracy, id. ¶ 16. While the amended complaint does not identify specific instances of conspiratorial conduct or communications, it does set forth the temporal and geographic parameters of the alleged illegal activity and the identities of the alleged key participants. It further alleges that the conduct was undertaken specifically to preserve historic monopoly conditions, and to thwart the pro-competitive purposes of the Telecommunications Act, id. ¶¶ 25-34, 47, a claim that, if true, would doubtless constitute an unreasonable restraint of trade. And it specifically alleges an effect on interstate commerce, noting that the defendants provide local telephone and high-speed Internet services "across state lines," that they "regularly and frequently solicited customers and sent bills and received payments via the mail throughout the United States," and that the "marketing, sale and provision of local telephone and/or high speed Internet services regularly occurs in and substantially affects interstate trade and commerce." Id. ¶ 52.
 
 
 72
 With respect to the allegation that the defendants conspired not to invade each other's territory, the amended complaint asserts that most of the defendants are dominant in particular geographic areas that surround small pieces of territory controlled by other defendants, yet none has attempted to compete meaningfully in the surrounded territories. Am. Compl. ¶¶ 40-41. The amended complaint further alleges that the ILECs have conceded that competing as CLECs would be inherently profitable, because they have complained that the Telecommunications Act requires them to charge CLECs below-cost rates for network access. Id. ¶ 39. In addition, the amended complaint points to the alleged admission by defendant Qwest's CEO that such competition "might be a good way to turn a quick dollar but that doesn't make it right," even though Qwest was losing considerable amounts of money at the time the statement was made. Id. ¶¶ 42-44.[14]
 
 
 73
 The factual allegations in support of the alleged conspiracy to keep CLECs from entering the ILECs' respective territories are that the ILECs have engaged in a variety of activities, such as interfering with the CLECs' customer relationships by continuing to bill customers who switched to the CLECs' services, denying the CLECs access to essential network equipment and facilities, and providing erroneous and confusing bills to the CLECs for their services, all designed to drive the CLECs out of business. Id. ¶ 47. According to the amended complaint, the defendants have frequent opportunities to organize and conduct their conspiracy through industry organizations, id. ¶ 46, and a common incentive to do so, because were even one ILEC to decline to participate, a successful CLEC in its territory would be better positioned to compete against other ILECs and would demonstrate that CLECs could succeed in the absence of anti-competitive conduct, id. ¶ 50.[15]
 
 
 74
 We conclude that these allegations[16] are sufficient to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," Conley, 355 U.S. at 47, 78 S.Ct. 99, and to "enable [the defendants] to answer and prepare for trial," Simmons, 49 F.3d at 86. Under the principles we have described and our decision in Discon, Inc. v. NYNEX Corp., supra, these allegations are enough successfully to withstand a motion to dismiss.
 
 
 75
 Whether the plaintiffs will be able to prevail in response to a motion for summary judgment after discovery or at trial is, of course, an entirely different matter. We have and express no view as to the merits of the plaintiffs' underlying claims and mean to imply none. Indeed, our analysis of the arguments made on appeal, which we have stated at some length, convinces us that it is premature to arrive at any such view. But even if "it . . . [were to] appear [to us] on the face of the pleadings that a recovery is very remote and unlikely . . . that is not the test" on a motion to dismiss, Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), and would not warrant an affirmance here.
 
 CONCLUSION
 
 76
 For the foregoing reasons, we vacate the judgment of the district court and remand the case to the court for further proceedings.
 
 
 
 Notes:
 
 
 [1]
 The defendants-appellees are: Bell Atlantic Corp. ("Bell Atlantic"), BellSouth Corp. ("BellSouth"), Qwest Communications International, Inc. ("Qwest"), SBC Communications Inc. ("SBC"), and Verizon Communications Inc. ("Verizon")
 
 
 [2]
 The penalty provisions of the Sherman Act were amended on June 22, 2004, after this appeal was filed, to increase the maximum fines to $100,000,000 for a corporation and $1,000,000 for any other person, or imprisonment of up to ten years, or bothSee Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub.L. No. 108-237, tit. II, § 215(a), 118 Stat. 661, 668.
 
 
 [3]
 Other provisions of Rule 8 are inextricably linked to Rule 8(a)'s simplified notice pleading standard. Rule 8(e)(1) states that "[n]o technical forms of pleading or motions are required," and Rule 8(f) provides that "[a]ll pleadings shall be so construed as to do substantial justice." This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims. "The provisions for discovery are so flexible and the provisions for pretrial procedure and summary judgment so effective, that attempted surprise in federal practice is aborted very easily, synthetic issues detected, and the gravamen of the dispute brought frankly into the open for the inspection of the court." 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1202, p. 76 (2d ed.1990)
 Wynder, 360 F.3d at 77 n. 6 (footnote in the original; renumbered).
 
 
 [4]
 The Court concluded, however, that it would be "improper" to dismiss the case without permitting the plaintiffs to amend their pleadingsKlebanow, 344 F.2d at 299-300.
 
 
 [5]
 One circuit court has employed this definition of "plausible" in another context: "`superficially worthy of belief: CREDIBLE.'"Mendoza Manimbao v. Ashcroft, 329 F.3d 655, 664 (9th Cir.2003) (quoting Webster's Third New International Dictionary 1736 (1976)). The Supreme Court in Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), used the same term in the context of a motion for summary judgment. See Matsushita, 475 U.S. at 596-97, 106 S.Ct. 1348 ("[T]he absence of any plausible motive to engage in the conduct charged is highly relevant to whether a `genuine issue for trial' exists within the meaning of Rule 56(e)."). As we note, however, language setting forth a summary judgment standard must be used with care in assessing a motion to dismiss.
 
 
 [6]
 The notion that a properly pleaded Section 1 claim must fall somewhere on the spectrum between providing more than not "furnish[ing] the slightest clue" as to what the defendants did wrong,Klebanow, 344 F.2d at 299, and offering "hundreds of specific instances" of malfeasance, Nagler, 248 F.2d at 326, comports with the law of our sister circuits, see, e.g., S. Austin Coalition Cmty. Council v. SBC Communications Inc., 274 F.3d 1168, 1171 (7th Cir.2001) ("As long as Rule 8 stands unaltered, and there is no antitrust parallel to the Private Securities Litigation Reform Act, courts must follow the norm that a complaint is sufficient if any state of the world consistent with the complaint could support relief." (emphasis in original)), cert. denied, 537 U.S. 814, 123 S.Ct. 81, 154 L.Ed.2d 18 (2002); DM Research, Inc., 170 F.3d at 55, 56 (noting that a Section 1 complaint "need not include evidentiary detail," but that "the discovery process is not available where, at the complaint stage, a plaintiff has nothing more than unlikely speculations"); Estate Constr. Co. v. Miller & Smith Holding Co., Inc., 14 F.3d 213, 221 (4th Cir.1994) ("[I]n order to adequately allege an antitrust conspiracy, the pleader must provide, whenever possible, some details of the time, place and alleged effect of the conspiracy; it is not enough merely to state that a conspiracy has taken place." (citations and internal quotation marks omitted, emphasis added)); Mun. Utils. Bd. v. Ala. Power Co., 934 F.2d 1493, 1501 (11th Cir.1991) ("A plaintiff must plead sufficient facts so that each element of the alleged antitrust violation can be identified. . . . However, the alleged facts need not be spelled out with exactitude." (citation and internal quotation marks omitted)); Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 182 (3d Cir.1988) ("`Although detail is unnecessary, the plaintiffs must plead the facts constituting the conspiracy, its object and accomplishment[, such as] . . . the date of the alleged conspiracy [or] its attendant circumstances . . . [or] who made [incriminating] statements, where, when or to whom.'") (quoting Black & Yates v. Mahogany Ass'n, 129 F.2d 227, 231-32 (3d Cir.1941)).
 
 
 [7]
 Conduct can be deemed unreasonable in two ways. Certain conduct is consideredper se unreasonable because it has "such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit." State Oil Co., 522 U.S. at 10, 118 S.Ct. 275. In most cases, however, conduct must be evaluated under a "rule of reason" standard, "according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." Id.
 
 
 [8]
 These requirements generally accord with those of courts in other Circuits, though some courts have chosen to divide the inquiry into three prongs, rather than twoSee, e.g., Tanaka v. Univ. of S. Cal., 252 F.3d 1059, 1062 (9th Cir.2001); Armstrong Surgical Ctr., Inc. v. Armstrong County Mem'l Hosp., 185 F.3d 154, 157 (3d Cir.1999), cert. denied, 530 U.S. 1261, 120 S.Ct. 2716, 147 L.Ed.2d 982 (2000); Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 961 F.2d 1148, 1158 (5th Cir.1992), cert. denied sub nom. Dillard v. Sec. Pacific Corp., 506 U.S. 1079, 113 S.Ct. 1046, 122 L.Ed.2d 355 (1993); In re Carbon Black Antitrust Litig., No. Civ. A. 03-10191-DPW, MDL No. 1543, 2005 WL 102966, at *5, 2005 U.S. Dist LEXIS 660, at *29 (D.Mass. Jan.18, 2005) [hereinafter "Carbon Black"].
 
 
 [9]
 The plaintiffs point to the holdings of various district courts that have recently reached similar conclusionsSee In re Tableware Antitrust Litig., 363 F.Supp.2d 1203, 1206 (N.D.Cal.2005) (noting that "[i]n considering whether a complaint provides insufficient factual support for a legally viable theory of relief, a useful thought experiment is to ask `what [the] plaintiff [could] plead in an amended complaint to repair the defect,'" and rejecting the proposition that Rule 8 requires allegations of "`when [the conspiracy] conversations took place, how many occurred, who participated, where the conversations took place, [and] what topics were discussed' as well as . . . `meeting dates,' `meeting places' and [names of] `individuals employed by . . . [d]efendants who allegedly participated'"); Carbon Black, 2005 WL 102966, at *7 n. 7, 2005 U.S. Dist LEXIS 660, at *35 n. 7 (noting that where the question is "[h]ow much evidence of an illegal agreement must antitrust plaintiffs plead to avoid dismissal for failure to state a claim . . . [t]he answer is certainly some quantum less than will be required at later stages" of the litigation (citation and internal quotation marks omitted, first alteration in original)); In re Pressure Sensitive Labelstock Antitrust Litig., 356 F.Supp.2d 484, 492 (M.D.Pa.2005) (noting that "a plaintiff `need not allege the existence of . . . plus factors in order to plead an antitrust cause of action'" (quoting Lum v. Bank of Am., 361 F.3d 217, 230 (3d Cir.2004) and adding emphasis)); N. Jackson Pharmacy, Inc. v. Express Scripts, Inc., 345 F.Supp.2d 1279, 1286 (N.D.Ala.2004) (noting that "`plus factor' allegations serve to substantiate a plaintiff's conspiracy allegation; their purpose is not to clarify an otherwise incomprehensible claim," and that "[j]ust as an employment-discrimination plaintiff need not allege `circumstances that support an inference of discrimination,' there is no need for an antitrust plaintiff to allege a `plus factor [which] generates an inference of illegal price fixing.'" (citations omitted, second alteration in original)).
 
 
 [10]
 But cf. Hickman v. Taylor, 329 U.S. 495, 507, 67 S.Ct. 385, 91 L.Ed. 451 (1947) ("[T]he deposition-discovery rules are to be accorded a broad and liberal treatment. No longer can the time-honored cry of `fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case.").
 
 
 [11]
 Charles Dickens,David Copperfield 159 (Jeremy Tambling ed., Penguin Books 1996) (1850). Cf. Weinstock v. Columbia Univ., 224 F.3d 33, 49-50 (2d Cir.2000) ("Plaintiff would have us follow the advice of David Copperfield's mentor, the amicable Mr. Micawber, and let matters proceed in the hope that `something will turn up.' This notion is inconsistent with the text and policy behind Rule 56 of the Federal Rules of Civil Procedure, which was intended to prevent such calendar profligacy." (citation omitted)).
 
 
 [12]
 The Federal Rules are not blind to the financial and other strains that meritless complaints place on defendants and on the judiciarySee, e.g., Fed.R.Civ.P. 1 ("These rules . . . shall be construed and administered to secure the just, speedy, and inexpensive determination of every action."). The Rules provide a variety of mechanisms for alleviating these burdens, see, e.g., Fed.R.Civ.P. 11(c) (providing sanctions against parties for making frivolous or baseless claims, or claims brought for an improper purpose), including provisions for ridding the courts and defendants of clearly non-meritorious litigation before discovery, see, e.g., Fed.R.Civ.P. 12(b)(6) (permitting dismissal for "failure to state a claim upon which relief can be granted"); Fed.R.Civ.P. 12(c) (permitting judgment on the pleadings). The Rules also provide "pretrial procedures . . . to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues," as well as to do away with non-meritorious claims as the litigation progresses. Conley, 355 U.S. at 48 & n. 9, 78 S.Ct. 99.
 
 
 [13]
 Congress has, for example, attempted to do just that with respect to securities litigationSee Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 77z-1-2, 78j-1, 78u-4-5 (1997 & Supp.2003); Securities Litigation Uniform Standards Act of 1998, Pub.L.No. 105-353, 112 Stat. 3227 (amending scattered provisions of 15 U.S.C., including 15 U.S.C. §§ 77p, 77v, 78bb).
 
 
 [14]
 The complaint also relies on a report by the CFA in support of the proposition that the defendants have "avoid[ed] head-to-head competition like the plague." Am. Compl. ¶ 47 (quoting CFA,Lessons From 1996 Telecommunications Act: Deregulation Before Meaningful Competition Spells Consumer Disaster 1 (Feb.2001) (citation and internal quotation marks omitted)). And it cites a letter from two members of the House of Representatives to the Attorney General requesting an investigation into alleged antitrust violations by the Baby Bells. Id. ¶ 45 (citing Letter from Rep. John Conyers Jr. and Rep. Zoe Lofgren to Attorney General John D. Ashcroft (Dec. 18, 2002)). These documents, however, even if they are ultimately deemed to constitute admissible evidence, are irrelevant at the pleading stage. An allegation that someone has made a similar allegation does not, without more, add anything to the complaint's allegations of fact.
 
 
 [15]
 The fact that the defendants have engaged in parallel conduct against their self-interest has been recognized as a "plus factor" that, if proved at trial, can support the inference of collusion necessary for a jury finding of conspiracyApex Oil, 822 F.2d at 254. Thus, while plaintiffs pursuing section 1 actions are not required to plead "plus factors" to state a claim of conspiracy based on parallel anticompetitive conduct, the fact that the plaintiffs appear to be able to do so here makes it particularly difficult to conclude that the allegations contained in the complaint are insufficient to state a claim.
 
 
 [16]
 The amended complaint again cites the CFA report, this time for the proposition that the defendants' actions against CLECs may be coordinatedId. ¶ 47. As we concluded, supra note 14, the CFA report consists of mere allegations, and thus does not provide factual support for the claims in the amended complaint.