WILKINSON, Circuit Judge,
concurring in part and dissenting in part:
The majority’s view of modern commerce is unfortunate. It takes an isolationist approach in which each business must all but lock itself in semi-solitary or risk the taint of antitrust claims. Whatever validity the isolationist approach may once have had, it is profoundly injurious in an increasingly interconnected, necessarily collaborative, and globalized marketplace. The majority rightly observes that agreement is the crux of an antitrust claim, but it has made mere communication the touchstone of liability. Ante at 428.
The majority rejects this as a statement of policy, ante at 434, 438, but it is hardly that. It is rather a statement of consequences that flow from the majority’s refusal to follow the Supreme Court’s decision in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), which established pleading requirements for a Sherman Act Section 1 complaint. The Supreme Court lacks the institutional resources to ensure full compliance with its decisions. Among other things, it has room on its docket for a limited number of cases, and the Twombly decisions from the lower courts may be routinely pitched as pertaining to no more than the particulars of an individual complaint.
It just may be, however, that the institutional limitations at the Court impart institutional obligations on the courts of appeals to respect in fullest measure the highest Court’s approach. In this obligation, I believe the majority has defaulted. I shall show throughout how it has failed to follow Twombly at every turn. I would suggest, most respectfully, that the majority has committed basic conceptual errors and that the consequences of those errors, which the majority prefers not to face and to dismiss as policy, are regrettable. Most regrettable, however, is the treatment of a Supreme Court decision, even a controversial one, at the hands of this court.
Among Twombly’s insights was that markets, every bit as much as conspiracies, play a significant role in governing commercial conduct. See 550 U.S. at 557, 127 S.Ct. 1955. Twombly counsels that we not leap to pejorative explanations when legitimate business considerations are more likely at play. Id. at 554, 127 S.Ct. 1955. The fact that Sherman Act conspiracies in restraint of trade do assuredly continue to exist does not mean that we should rush too quickly to drape innocent commercial activity in sinister garb.
The majority, however, adopts the reverse sequence. It fashions a template for the frustrated market participant: Whenever routine business decisions don’t go your way, for whatever reason, simply claim an industry conspiracy under the Sherman Act and the courts will infer malfeasance. But such casual presumptions of antitrust infractions can only chill communications among companies, which in turn may hinder product development, innovative joint ventures, and useful trade association conclaves. WARNING: HOLDING OR ATTENDING THIS TRADE ASSOCIATION MEETING WILL INCREASE YOUR EXPOSURE TO ANTITRUST SUITS.
The chilling effect is most acute when the majority considers independent market-driven behavior to be parallel conduct warranting antitrust scrutiny. Parallel in *444 dustry conduct is, of course, the lynchpin of many a Sherman Act Section 1 claim. The majority’s cardinal conceptual error lies in the adoption of an ends-based approach to parallel conduct in a circumstantial antitrust case. See infra Part II.A. The end of course is the fact that a plaintiffs product was not adopted. But the products most likely to meet the end of rejection are those of the least utility or those that would cause the most expense. The majority thus uses its ends-based analysis to reward the least marketable products with the greatest possibility of litigation success. WARNING: FAILURE TO ADOPT THIS PRODUCT FOR WHATEVER REASON WILL INCREASE YOUR EXPOSURE TO ANTITRUST SUITS.
This treatment of ends and means in antitrust litigation undermines the Twom-bly decision. An analysis of means rather than ends is the most sensitive tool we possess to measure the plausibility of a complaint. See Twombly, 550 U.S. 544, 127 S.Ct. 1955. And here, the means by which the so-called conspiracy was carried out paint a clear picture of non-parallel conduct. The complaint is the best evidence of that. After SD3 introduced its product, certain defendants entered into licensing negotiations that continued well after the alleged group boycott agreement. Some of them offered to license the technology, again after the supposed agreement, and were rebuffed by SD3. Other negotiations yielded no offers, with one defendant leaving the table saw industry altogether.. The vast majority of named defendants are not even mentioned in SD3’s account of the supposedly “parallel” behavior. Their negotiation posture, which would seem well within plaintiffs’ knowledge, is nowhere set forth or detailed.
While the majority highlights cases in which plaintiffs successfully alleged parallel conduct, none of them features disparate actions such as these. If defendants’ behavior qualifies as parallel conduct, then plainly divergent actions among competitors in any field will now give rise to antitrust claims. This is but part and parcel of the majority’s attempt to impose a presumption of guilt on antitrust defendants who now must bear the burden of proving a negative when the burden properly lies with the party bringing the claim.
It is no accident that Twombly itself was an antitrust decision. For what we confront in antitrust law is a perfect storm of treble damages, large discovery costs, and relaxed pleading standards. It is the three factors in combination that pose a threat to legitimate marketplace behavior. The Supreme Court in Twombly sought to calm the waters by addressing the latter two. The majority, however, adds to the turbulence by sanctioning complaints that would in all likelihood have failed even under pre-Twombly standards. Here, plaintiffs are the ones acting anti-eompeti-tively. They seek to achieve through litigation a monopoly for their product that neither the table saw market nor contractual negotiations would yield. The result, as noted, is that marketplace failures will increasingly lead to litigation success. And that is only the beginning of the difficulty.
The majority appears to believe that the full course of discovery is the proper mechanism for winnowing out meritless claims. In many fields, that observation would be correct. The bone of contention in federal civil litigation is most frequently over summary judgment versus trial. In antitrust law, however, the flashpoint is often over motions to dismiss versus summary judgment. For the Supreme Court has clearly recognized that in the area of *445 antitrust it is the threat of steep litigation costs that produces deleterious consequences in and of itself, no matter who the victor in the antitrust marathon may ultimately prove to be.
As Twombly emphasized, discovery costs have escalated dramatically since the adoption of the Federal Rules. Twombly, 550 U.S. at 558-60, 127 S.Ct. 1955; see Brian T. Fitzpatrick, Twombly and Iqbal Reconsidered, 87 Notre Dame L.Rev. 1621, 1638 (2012). Multiplying electronic and paper records, combined with increased regulatory obligations, have caused discovery costs to mount even further since the issuance of Twombly itself. Before we impose these climbing costs on companies, there must exist confidence that the claims leveled against them allege actual facts that make conspiracy and other illicit intentions pláusible. SD3 fails to clear this bar, but still the majority just piles it on.
I.
A.
The majority’s approach to Twombly tells an old intermediate appellate story. The majority alights on a minor motif of that Supreme Court decision, while leaving its main point wholly unobserved. The Court made clear in Twombly, and reiterated in Iqbal, that a plaintiff must allege enough factual content in the complaint to render his legal claim for relief “plausible on its face” in order to survive a motion to dismiss under Rule 12(b)(6). Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing Twombly, 550 U.S. at 570, 127 S.Ct. 1955). Plausibility requires “more than a sheer possibility that a defendant acted unlawfully.” Id. (citation omitted). SD3’s complaint cannot clear this hurdle. Its conelusory assertions that defendants agreed to, an indus- . try-wide “boycott” of its product are fully consistent with, and most plausibly reflect, independent and legitimate business decisions. Put simply, the majority proceeds as if Twombly were at most persuasive authority, and not very persuasive authority at that.
Twombly is particularly important here, for the Supreme Court in that case addressed the meaning of plausibility in the context of a conspiracy allegation based on descriptions of parallel conduct. The Court .instructed that “when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.” Twombly, 550 U.S. at 557, 127 S.Ct. 1955. “Even ‘conscious parallelism,’ a common reaction of ‘firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions’ is ‘not in itself unlawful.’ ” Id. at 553-54, 127 S.Ct. 1955 (citations omitted). Nor should a court infer “that the companies had agreed among themselves to do what was only natural anyway.” Id. at 566, 127 S.Ct. 1955. Thus, a plaintiff fails to adequately plead his claim that a defendant unlawfully conspired under Section 1 if there exists an “obvious alternative explanation” for the defendant’s conduct that renders the prohibited explanation implausible. Iqbal, 556 U.S. at 682, 129 S.Ct. 1937 (citation omitted); Twombly, 550 U.S. at 567, 127 S.Ct. 1955.
This could not be more clear. In light of Twombly’s directives, SD3’s allegations fall well short of the plausibility requirement. The complaint hardly bespeaks a collective agreement not to deal. Instead, it most plausibly reflects typical market forces at work and rational business choices being made — the kind of things that happen every day. Why did the manufacturers not *446 adopt SD3’s product? Perhaps they realized the technology was too nascent to license, in short unproven. Perhaps it would not have been cost effective for the manufacturers to incorporate it. Or perhaps SD3’s incipient product actually increased the risk of injury to consumers. These varied market explanations may well have been different for different companies. They reflect business decisions of the most common and ordinary character. They are “obvious alternative explanations” apd have not been sufficiently rebutted by any valid assertions of a preceding agreement to collude. All the behavior described by SD3 “was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior.” Iqbal, 556 U.S. at 680, 129 S.Ct. 1937 (quoting Twombly, 550 U.S. at 567, 127 S.Ct. 1955).
In the majority’s eyes, however, the above discussion is all wasted effort, merely “practical reasons” and “factual suppositions” that must not be considered. Ante at 430, 441. Instead, we should take plaintiffs’ allegations at face value and call it a day. It is certainly true that we assume the truth of factual allegations at the motion-to-dismiss stage. Twombly, 550 U.S. at 572, 127 S.Ct. 1955 (citations omitted). Even after accepting plaintiffs’ claims as true, however, the court must further analyze whether those allegations are “plausible” under Twombly. Id. at 556, 127 S.Ct. 1955. The majority refuses to undertake this second, more analytic step. My concurring colleague simply wishes it away. There is a time warp here, a nostalgia for the old pleading ways and days. Those earlier standards were easier on us, I admit. But our nostalgia now flies in the face of a controlling Supreme Court decision.
SD3’s boycott claim is not “plausible” for the same reasons Twombly’s was not plausible. SD3’s boycott claim is hardly distinguishable from' the very allegations that the Supreme Court rejected in Twombly. According to the complaint in that case, defendants — who, like the defendants here, owned a significant share of the market— agreed to “engage in parallel conduct” and “prevent competitive entry.” Twombly, 550 U.S. at 550-51, 550 n. 1, 127 S.Ct. 1955. The complaint charged that the defendants’ “ ‘compelling common motivation’ to thwart plaintiffs’ competitive efforts naturally led them to form a conspiracy.” Id. at 551, 127 S.Ct. 1955. If these allegations sound familiar, it is because they almost perfectly parrot the claims made by SD3 in its complaint. SD3 argued that the defendants — at least the few named defendants it actually bothered to discuss— “agreed among themselves to collectively refuse” SD3’s licensing offers “based on a calculated economic determination” that they would fare better in the marketplace if SD3 were excluded. J.A. 71, 90. If Twombly’s complaint could not pass as well-pleaded, then SD3’s should not fare any better.
The majority claims that the complaint in Twombly “rested solely on descriptions of parallel conduct, and not on any independent allegation of actual agreement.” Ante at 443 (citation and internal quotation marks omitted). This is simply incorrect. The majority overlooks the actual language in the Twombly complaint: “Defendants had compelling common motivations to include in then- unlawful horizontal agreement an agreement that each of them would engage in a course of concerted conduct calculated to prevent effective competition from [plaintiffs].... ” Amended Complaint at ¶ 50, Twombly v. Bell Atl. Corp., 313 F.Supp.2d 174 (S.D.N.Y.2003); see also id. at ¶ 51 (noting that defendants “have agreed not to compete with one another”). To be sure, after Twombly complaints have sought length in the hope *447 that courts would mistake such length for substance. But the substance here is thin gruel. The complaint’s allegation of an agreement is weaker than in Tiuombly, boiling down to a contention that the defendants met at a trade association meeting followed by the inconvenient fact for the majority that non-parallel conduct ensued.
In fact, the Twombly complaint was much stronger than the one in this case and it went much further. That complaint relied on evidence that defendants refused to provide plaintiffs with network connections and services of equal quality, that they billed plaintiffs’ customers in a manner to ruin plaintiffs’ customer relations, that they refused plaintiffs access to certain facilities and delayed the provision of network elements after plaintiffs had invested tens of billions of dollars. Twombly, 313 F.Supp.2d at 177-78. Despite this support for plaintiffs’ conspiracy allegations, the Court maintained that each defendant “had reason to want to avoid dealing with plaintiffs,” and each defendant “would attempt to keep plaintiffs out, regardless of the actions of the other” defendants. Twombly, 550 U.S. at 566, 127 S.Ct. 1955. Defendants’ actions in Twom-bly, like defendants’ actions in this ease, were “just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.” Id. at 554, 127 S.Ct. 1955 (citation omitted). Consequently, plaintiffs’ conspiracy claims in both cases “stop short of the line between possibility and plausibility.” Id. at 557, 127 S.Ct. 1955 (citation omitted). If only the plaintiffs in Twombly could have called upon this court to refashion their complaint.
B.
But, insists the majority, “[t]o dismiss SawStop’s complaint because of some initial skepticism would be to mistakenly ‘collapse discovery, summary judgment[,] and trial into the pleading stages of a case.’ ... District courts possess a number of tools ... to combat any sort of predatory discovery.” Ante at 434 (citation omitted). That approach is astonishing, for it is precisely what Twombly warned against: “It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process ... given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side.” Twombly, 550 U.S. at 559, 127 S.Ct. 1955 (citation omitted).
The majority’s assurance that of course district courts can control discovery is the sort of appellaté wand-waving that ignores every reality on the ground. Trial judges are busy; they must set priorities. Many understandably feel that time is better spent in trial or in dealing with dispositive motions to dismiss or for summary judgment than in wading into the big muddy of discovery disputes. There is the temptation, and it is again an understandable one, to say to the parties, “Folks, go work this out among yourselves.” The problem has become even more acute with the advent of e-discovery. Modern electronic devices generate and record a great variety and volume of information. It is now easier and faster to store evidence, which in turn has spawned greater opportunities for discovery requests and conflict. Regulatory mandates from governments at every level add to the store of both paper and electronic files. All of this makes companies more and more vulnerable to open-ended discovery requests. The majority pays no more than lip service to what has become a serious problem. Its casualness stands in contrast to the gravity of the Twombly Court’s concern.
*448 To overlook this concern is to resurrect the dangers that Twombly sought to lay to rest. Conley v. Gibson was doubtless correct when decided. See 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), abrogated by Twombly, 550 U.S. 544, 127 S.Ct. 1955. It made sense to skip through the pleadings on the theory that discovery would somehow sort it all out. See id. at 47-48, 78 S.Ct. 99. But times have changed. Although the majority pooh-poohs “the expense of modern antitrust litigation,” ante at 434, it is altogether legitimate for the Supreme Court to take cognizance of the shifting interplay between causes of action (here Sherman Act Section 1 claims) and the Federal Rules (here those of pleading and discovery). Thus, the Court in Twombly sought to shield defendants from what it later described as the “heavy costs of litigation in terms of efficiency and expenditure of valuable time and resources” by allocating the plausibility burden to those who allege unlawful conduct. Iqbal, 556 U.S. at 685, 129 S.Ct. 1937.
The Court understood what the majority does not: that an antitrust complaint is often too tempting to pass up. It provides a tantalizing weapon for parties whose business endeavors are going badly. The term “conspiracy” is bound to stoke paranoia, and to kindle an effort to pin on others the blame for business failures of one’s own. The treble damages awards of antitrust actions are a further temptation for floundering companies armed with the knowledge that defendants would rather settle than face the prospect of such damages, especially with the attendant high litigation costs. See Twombly, 550 U.S. at 558-59, 127 S.Ct. 1955. Twombly sought to reduce these dangers in language of no moment to the majority: “It is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery....” Id. at 559, 127 S.Ct. 1955. So much for that hope: the majority just loads it on.
II.
A.
With its inverted version of Twombly, the majority allows plaintiffs to contort normal marketplace behavior into a potential antitrust violation. Even by the ma-' jority’s diluted pleading standard, however, SD3’s group boycott claim fails as its complaint plainly alleges wm-parallel conduct. The majority bases its contrary conclusion on an expansive definition of parallel conduct focused solely on a perceived uniformity of ends without regard to dissimilarity of means. The majority observes: “The similar or uniform actions alleged are obvious: none of the defendants ultimately took a license or otherwise implemented SawStop’s technology.” Ante at 427. The defendants’ vastly “different courses of action” are seen as part of some grand scheme to conceal the underlying conspiracy. Ante at 427. By that logic, the majority would find parallel conduct as long as defendants all allegedly reached the same end — not adopting a product — regardless of how the dealings between plaintiffs and defendants proceeded or fell apart.
Such an ends-based focus misses the entire point of Twombly, which is to determine whether allegedly anticompetitive conduct “stems from independent decision or from an agreement, tacit or express.” Twombly, 550 U.S. at 553, 127 S.Ct. 1955 (citation omitted). If defendants act in parallel whenever they arrive at the same general end or outcome, then parallel conduct will embrace independent but identical business decisions borne by market forces — precisely the conduct that Twom-bly excluded from antitrust liability. In distinguishing horizontal conspiracies from *449 innocuous coincidences, the means matter. That competitors travelled divergent paths to the same end reflects the absence, not the presence, of illicit coordination or agreement.
Certainly, direct evidence of a collusive end would amount to a plausible Section 1 claim. See American Chiropractic Ass’n v. Trigon Healthcare, Inc., 367 F.3d 212, 226 (4th Cir.2004) (“Direct evidence in antitrust cases is explicit and requires no inferences to establish the proposition or conclusion being asserted.”). By contrast, when plaintiffs rely on circumstantial evidence of conspiracy, as in Twombly and the case at hand, the ends-based approach carries an unacceptably high risk of finding parallel conduct in wildly disparate behaviors motivated by independent economic concerns. With its over-inclusive sweep, the majority erodes the long-recognized right of one party not to deal with another. Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 761, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). As long as competitors respond in the same way to an unappealing offer or product, a business’s refusal to deal now becomes part of parallel conduct potentially triggering antitrust liability.
The assumption running throughout the complaint is that SawStop was the only product anyone could have thought of adopting. No other business decision could have been reasonable. Therefore, defendants’ rejection of SawStop must have been part of a group boycott. Case closed. We are not told exactly why SD3’s product was demonstrably superior to other competing products in terms of cost effectiveness and safety, such that only one business decision, with respect to it was conceivable. The naked assumption of its irresistible appeal and inevitable adoption operates in a comparative vacuum. But defendants faced comparative decisions. They had to weigh options. The majority’s ready acceptance of SD3’s unsupported superiority assumption is part of the fallacy of its ends-based perspective, namely that any ultimate refusal to adopt is nothing more than one more instance of parallel behavior.
A means-based analysis, one that focuses on the means by which the so-called conspiracy was carried out, is the most sensitive gauge of parallel conduct and complaint plausibility. The majority contends the dissent would find parallel conduct “only when defendants move'in relative lockstep” or “by substantially identical means.” Ante at 429. Not so. A focus on means-based analysis comes nowhere close to requiring identical means. As circumstantial evidence of a conspiracy, the similarity of conduct lies along a spectrum. Beyond a certain point, starkly dissimilar means render a secret agreement among competitors less plausible. The majority dismisses this means-based analysis, apparently because dissimilar means “might also be read to suggest deception” rather than independent business activity. Ante at 428. The majority thus sets a nifty trap: if defendants engage in similar means, it’s collusion; if they engage in dissimilar means, it’s deceit. Given those options, businesses should either keep to themselves or close up shop.
For good reason then, courts have shied away from the majority’s ends-driven conception of parallel conduct and instead required more specific similarities. See, e.g., Cosmetic Gallery, Inc. v. Schoeneman Corp., 495 F.3d 46, 54 (3d. Cir.2007) (deeming uniform refusal to sell insufficient to show conscious parallelism because one distributor decided not to deal prior to the alleged agreement); LaFlamme v. Societe Air France, 702 F.Supp.2d 136, 151 (E.D.N.Y.2010) (casting doubt on parallel conduct claim where *450 defendants engaged in disparate strategies at different times); City of Moundridge v. Exxon Mobil Corp., 429 F.Supp.2d 117, 131-32 (D.D.C.2006) (expressing skepticism towards an allegation of parallel conduct based on evidence that defendants did no more than exchange information). Although the majority insists these cases foundered on findings of “non-parallel ends,” their common failing was in fact patently disparate means. Ante at 428-29 (emphasis added) (internal quotation marks omitted).
Turning to the means here, there is simply nothing parallel about separate licensing discussions proceeding along separate timetables with different results and different motivations. SD3 alleges that defendants collectively agreed not to license its technology in October 2001. J.A. 89-90. Defendants then supposedly “found ways to abort” the negotiations and conceal their agreement by “giving separate excuses.” J.A. 91, 94. As stated in the complaint, however, three defendants continued to negotiate with SD3 after October 2001 while the fourth, Bosch, ended negotiations a month before and restarted discussions years later. J.A. 88, 92. Ryo-bi sent a signed non-exclusive licensing agreement to SD3 in January 2002 — three months after the so-called collective refusal to deal. J.A. 91-92. The contract offered a 3% royalty initially that would increase to 5%-8% if the technology proved successful on the market. J.A. 91-92. SD3 refused to accept what appear to be generous terms based on a minor wording issue. J.A. 92. Emerson offered the same royalty rate as Ryobi and participated in negotiations for several months after October 2001, eventually ending talks and leaving the table saw industry altogether the following year. J.A. 56-57, 97. Six months after the alleged refusal to deal, Black & Decker offered SD3 a licensing agreement with a 1% royalty. J.A. 92. SD3 balked at what it considered unreasonably stingy terms for its untested and undeveloped technology. Id. If all this is parallel conduct and evidence of a refusal to deal, well then anything will qualify.
And yet, despite all this, the agreement is repeatedly characterized as a refusal to deal. E.g., ante at 427-28. How can this be? Defendants did deal and did offer to purchase SD3’s technology. How were the eighteen defendants not discussed in the complaint supposed to deal when, insofar as the complaint is concerned, they were never even approached?
In short, all four discussed defendants were willing to deal with SD3 but their negotiations broke down at various times for various reasons, not least because SD3 demanded more than defendants were willing to offer. The record shows no refusal to deal, much less parallel means to that end. It is not plausible to think that the defendants’ disparate actions were somehow a carefully choreographed plan to exclude SD3 from the market. By supposing it possible, the majority severely underestimates the difficulty of getting a group of competitors to agree on a course of action that separate contract negotiations may or may not have shown to be in their best commercial interest. It would be quite a feat of stage management, moreover, to have some of those competitors actually extend generous but different licensing offers at different times to the very party that was the subject of the supposed group boycott. This is the type of claim on the far margins of conceivability that Twombly condemned.
The Hail Mary nature of SD3’s complaint is underscored by the fact that only four of twenty-two named defendants are even so much as discussed in the allegations (the “twenty-two” figure comes from the original complaint as one defendant *451 somehow failed to appear in the amended version). Compare J.A. 30 (original complaint) with J.A. 70 (amended complaint). Indeed, even the majority chides plaintiffs for “assembling] some collection of defendants and then mak[ing] vague, non-specific allegations against all of them as a group.” Ante at 422.
Even plaintiffs appear to realize how tenuous their claim of parallel conduct is. In contrast to the original complaint, SD3’s amended complaint collapses its description of the various negotiations and time-lines to create an illusion of uniformity. Compare J.A. 55-58 (original complaint) with J.A. 88-93 (amended complaint). While the original version details each of the discussed defendant’s negotiation history in a separate section, plaintiffs’ second effort weaves those divergent strands into one vague narrative, obscuring dates and distinctions along the way. Id.
This attempt at obfuscation hardly inspires confidence in SD3’s promise that discovery will bolster its claims. Even with its artful redrafting, however, SD3 falls short of the bare minimum required for alleging a group boycott. To hold otherwise is to use antitrust law to badly skew the market forces normally at play in contract negotiations. From now on, defendants decline to deal with an entity proposing any new design feature of product development at their peril. They also cannot refuse to purchase a product in the course of licensing negotiations because that too, under the majority’s rubric, is grounds for possible antitrust liability if others arrive independently at a similar business judgment. Again, SD3’s attempt to achieve through litigation more than what markets or contracts would ever independently confer is precisely the kind of abuse of Sherman Act claims that Twom-bly sought to prohibit.
B.
The majority believes that all the nonparallel behavior and disparate means of proceeding were hatched in secret. The concurrence makes much of the fact that the meeting among table saw manufacturers was “secret.” Ante at 438-40. In fact, no fewer than four times does the concurring opinion refer to the alleged agreement not to deal as a “secret agreement” or a “pact [kept] secret.” Id. This is manifestly a cover for the fact that my concurring colleague is unable to point to the traces of an agreement, hoping, I suppose, that a fishing expedition will unearth them.
But there is a larger problem here. These days secrets are harder to keep. A secret is something that is held by only one. Or maybe two. But twenty-two? Managers everywhere must be relieved to learn from my concurring colleague that you can let twenty-two people in on a secret and have nothing leak out.
We also run into a significant collective action difficulty here. The larger the alleged conspiracy, the larger the number of alleged participants that need to be brought into line both as to the object and execution of the conspiracy as well as the need to keep it secret. The vast number of antitrust cases involve a much smaller number of conspirators, and it is telling that my concurring friend must venture back to the 1990s even to find an inappo-site situation. The concurrence again labels the dissent’s discussion of collective action problems a foray into policy. It is not. It is an inquiry into plausibility, which Tivombly absolutely requires that we undertake. The failure to do this is but one more example of the majority’s failure to follow that decision.

C.

Assuming, though only for the sake of argument, that plaintiffs had properly al *452 leged parallel conduct, the amended complaint still fails to show the “something more” needed to turn conscious parallelism into a plausible conspiracy. Twombly, 550 U.S. at 560, 127 S.Ct. 1955. The majority contends that the “more” necessary to nudge SD3’s group boycott claim across the goal line is the complaint’s identification of “the particular time, place, and manner in which the boycott initially formed, describing a separate meeting [among table saw manufacturers] held for that purpose during the Power Tool Institute’s October 2001 annual meeting.” Ante at 430 (citation omitted). • This, we are told, is “the heart of SawStop’s complaint.” Ante at 430.
But perfectly lawful trade association meetings do in fact take place on a particular day at a particular time for a particular purpose. And the majority’s assertion that table saw manufacturers broke off in a “separate meeting” in the course of a larger trade convention is nothing more than a description of ordinary conduct. Indeed, it would be unusual for a bar association meeting, health care convention, or any other industry-wide gathering not to break out into more specialized subgroups to discuss matters of common interest. We need not coin the term “breakout discussion liability” to note that these sessions have long been a staple of business and professional life, and the majority has now made even this form of communication more perilous.
Courts have recognized behavior contrary to defendants’ economic interests as a plus factor for showing concerted action. See, e.g., Hyland v. HomeServices of America, Inc., 771 F.3d 310, 320 (6th Cir.2014). It is hard to see how any defendant in this case acted against its economic interest. SD3 boldly asserts that, but for the boycott, all table saw manufacturers would have licensed its technology. J.A. 92. There is little support for such inflated self-confidence. Plaintiffs conceded that any licensing agreements could not have taken effect until 2004, and that its technology would not have been fully implemented until 2008 — years after it demanded industry-wide acceptance. J.A. 92. Defendants were also concerned that the new technology could actually increase hand injuries, discourage the use of blade guards, and fail to address “kickback” injuries. J.A. 87, 101. Despite the lukewarm reception, SD3 set its royalty rate at approximately 8% of wholesale prices, a costly gamble for manufacturers operating on often thin and always uncertain profit margins. Response Br. 1; J.A. 86. For all these reasons, it was consistent with each manufacturer’s best interest to reject an expensive, unproven, undeveloped, and possibly unsafe technology. Each defendant could easily have arrived at this business decision on its own.
One recalls the World’s Fairs at the end of the nineteenth and beginning of the twentieth century. They were held almost annually, most often serving as the epicenter for a brisk competition among participating countries to produce the most creative and technologically advanced exhibitions. It was then, as now, a time of unusual inventiveness. The fairs were humming with booths, tables, exhibits, and displays all designed to show off new technologies and -create a buzz about new products. Some of those products succeeded spectacularly; a far larger number cratered. The point is simply that manufacturers should be able to take into account the time it takes, after the initial hype, for an invention to become one of practical and marketable utility that would not expose consumers to injury or manufacturers to liability. The majority, however, takes no cognizance of lag time, which not only exists, as it always has, in product development but in the *453 most highly touted medical discoveries. Yet consciousness of lag time is something no prudent business is without.
Ignoring the many practical reasons for declining SD3’s offers, the majority hones in on the fear of product liability as the key motivation behind defendants’ alleged boycott. Ante at 481-32. This, we are told, is the “why.”[1] Ante at 431. Defendants counter that no manufacturer rushed to adopt SawStop technology even after SD3 began producing its own saws in 2004. Response Br. 32. The majority answers on plaintiffs’ behalf: SD3 remained too small a player in the table saw market to pose a significant threat in products liability suits. Ante at 431. Yet the earlier products liability cases involving SawStop technology focused on the “mechanical feasibility,” not the market share, of a “safer alternative design.” Osorio v. One World Technologies Inc., 659 F.3d 81, 85 (1st Cir.2011) (citation omitted). Different design features anywhere in use are routinely used comparatively in products liability litigation. SD3’s entry into the market should have put defendants at a serious disadvantage in products liability suits. J.A. 90. And yet still defendants refused to bite at SD3’s product. Either they were never motivated by product liability concerns in the first place or those concerns were outweighed by other drawbacks (too costly, ineffective, or unsafe) to licensing SawStop technology.
Of course, if manufacturers miscalculate in failing to adopt safer technologies, products liability lies in wait. But products liability and antitrust law each serve different and valid interests. Nothing is to be gained by scrambling them in a way that has the two bodies of law working at cross purposes such that manufacturers are forbidden, on pain of antitrust liability, from discussing and weighing product liability concerns.
D.
By casting product liability concerns as the driver of anticompetitive conduct, the majority risks curtailing communication critical to technological development. We would seemingly want manufacturers to be concerned about products liability. Products liability law exists to make businesses cognizant of the risks their products create and to encourage them to take steps to avoid such liability. Open and honest dialogue among competitors can help locate product vulnerabilities and formulate solutions, hopefully leading to improved consumer safety. But the majority forces the defendants into yet another a double bind: They face product liability suits either for refusing to use what SD3 alleges is a safer product or for adopting an untested product that could well fail to work as advertised. The industry would have been foolish not to discuss the risks either way. It makes little sense to dampen such discussions prematurely with the specter of antitrust liability.
Working together, whether cooperating in a joint venture or simply exchanging information at a trade association meeting, can not only save industry participants— *454 and therefore consumers — time and money but can also spawn innovations that no participant could have achieved alone. Given the speed at which product development now moves and the increased specialization of many industries, “much innovation today is likely to require lateral and horizontal linkages as well as vertical ones.” Thomas M. Jorde & David J. Teece, Rule of Reason Analysis of Horizontal Arrangements: Agreements Designed to Advance Innovation and Commercialize Technology, 61 Antitrust L.J. 579, 590 (1993). Particularly for smaller firms with limited resources or in patent-heavy industries, professional conclaves offer an efficient means of acquiring information. In an ever more complex world, sharing information becomes vital to the holistic perspectives so crucial for highly specialized companies to keep pace. To that end, sharing information assists American industry in the increasingly competitive global marketplace..
To take but one example, industry-wide coordination has been a driving force for technological progress in American semiconductor manufacturing. In 1987, semiconductor producers established a consortium that pooled resources and gathered information from across what was then a stagnant industry. Thomas M. Jorde & David J. Teece, Innovation, Cooperation and Antitrust, 4 Berkeley Tech. L.J. 1, 35 (1989). Since then, semiconductor manufacturers not only reduced the size of them circuits — from 500 nanometers (nm) to 45 nm — but they also more than quadrupled the number of transistors, or amplifiers, in semiconductor chips. Rahul Kapoor & Pa-tia J. McGrath, Unmaski-ng the Interplay Between Technology Evolution and R & D Collaboration: Evidence from the Global Semiconductor Manufacturing Industry, 1990-2010, 43 Res. Pol’y 555, 559 (2014).
Standard-setting bodies offer similar advantages. See Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 500-01, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988). Compatibility standards make markets more efficient by making parts interchangeable, benefitting both producers and consumers who want to change products or shop around. Joseph Farrell & Garth Saloner, Standardization, Compatibility, & Innovation, 16 Rand J. Econ. 70, 70-71 (1985). And properly devised safety standards both provide consumers some guarantee of minimum safety and encourage producers to adopt safer albeit more expensive features, buoyed by the hope that consumers may realize these products are more expensive because they are safer to use. The standards thus help to prevent cheaper, shoddy or unsafe products from undercutting manufacturers trying to protect consumer welfare. These and many other benefits to consumers and competition alike can accrue from standardization.
I commend the majority for recognizing some of the virtues of standard-setting organizations.[2] Ante at 435. In doing so, however, it gets caught in a contradiction: the majority acknowledges the monopolistic aims in plaintiffs’ standard-setting conspiracy claim but turns a blind eye to the same anticompetitive impulse driving SD3’s group, boycott allegation. Compare ante at 436-38 with ante at 431. Its opinion fails to comprehend the totality of what SD3 aims to achieve here.
When taken in its entirety, plaintiffs’ use of antitrust law strikes at the heart of even *455 the most constructive horizontal cooperation. I recognize that collaboration may-shade into collusion, the very evil that the Sherman Act was designed to prevent. See, e.g., Am. Soc’y of Mech. Eng’rs, Inc. v. Hydrolevel Corp., 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) (finding liability where competitors incorrectly declared product unsafe to exclude it from market); Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961) (finding valid cause of action when competitors excluded innovative product from market through non-objective safety standards).
And yet many minds may be better than one. Joint ventures, standard-setting organizations, and trade association meetings may allow individuals of different specialties to benefit from each other’s expertise. These fora may prove invaluable for efficient and effective product development. Those efficiencies in turn generate reduced costs of doing business that can then be passed along to the consumer in the form of reduced prices and better products. Some forms of collaborative endeavors, in other words, are not so inherently conspiratorial that their benefits can be overlooked. The majority ignores all this in its rush to flatten pleading standards, make communications perilous, and consign antitrust law to isolationist ends. It is an odd time for the majority to assume a more isolationist stance. It raises the risk that antitrust law will render American companies comparatively incommunicative and thus at a competitive disadvantage at the very time global commercial interactions are becoming more commonplace.
III.
I have seldom read a complaint where so many defendants were named in the complaint (twenty-two) and so few were actually discussed (four). I have seldom seen a complaint in which a supposed group boycott fell apart for so many reasons and in so many directions. Even applying the most generous assumptions, one is hard pressed to find a plausible group boycott claim in defendants’ divergent and market-explicable conduct. After all, SD3 has not been excluded from the marketplace. Its SawStop technology is currently available through its own production. Though it would have liked to corner the market through the industry’s leading manufacturers and standard-setting organization, it had no right to establish what was in effect a monopoly all its own. SD3 aims to force all manufacturers, through its group boycott claim, to adopt its technology at its prices and to have the industry’s standard-setting organization do the same.
It is disappointing that such a skimpy complaint pressing such anticompetitive ends should be allowed to traduce the Twombly standard and coopt antitrust law for the precise monopolistic purposes that the Sherman Act was designed to prevent. The fallout will disable American companies from all sorts of cooperative communication, from the most innocuous to the most productive. If the complaint had spun even a remotely plausible narrative of impermissible collusion, I should have been the first to wave it through the Twombly gates. See, e.g., Robertson v. Sea Pines Real Estate, 679 F.3d 278 (4th Cir.2012). But I cannot conspire with my colleagues in the demise of the Twombly decision. For the reasons stated above, I respectfully dissent.

. In making this point, the majority credits scraps of testimony from David Peot cherry-picked by SD3 while it ignores the district court's diligent review of the full trial transcript, Ante at 431. When read in full, Peot’s testimony focused on defendants’ joint venture, formed years after the alleged group boycott. J.A. 134-40. Far from revealing a collective refusal to deal, Peot clarified that defendants planned "to use whatever technology we felt would be best to prevent table saw accidents. There were no limitations that I can remember one way or the other.” J.A. 140. This discrepancy is emblematic of plaintiffs’ attempt to conjure a conspiracy and of the majority's willingness to overlook the holes in the narrative.

. I thus concur in Part Vi of the majority opinion dismissing SD3’s challenge to the actions of the standard-setting organization, Underwriters Laboratories, Inc. (UL). I also concur in Part III rejecting SD3’s claims against a number of defendants simply lumped into a conspiracy through nothing more than conclusory allegations.